**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

---

In re W.R. Grace & Company, et al.          :

Bradley M. Campbell, Commissioner          :          Bankruptcy Case No. 01-1139
of the New Jersey Department of
Environmental Protection, in his          :          On Appeal from a Final
official capacity, Peter C. Harvey,                   Decision of the United
Attorney General of New Jersey,          :          States Bankruptcy Court
in his official capacity,                             District of Delaware
                                         :          Hon. Judith K. Fitzgerald
          Appellants,
                                         :          Adversary No. 05-52724
               v.                                   Appeal Number 08-250
                                         :
W.R. Grace & CO.,
                                         :
          Appellees.
                                         :

---

BRIEF AND APPENDIX OF APPELLANT BRADLEY M. CAMPBELL ET AL

---

ANNE MILGRAM
ATTORNEY GENERAL OF NEW JERSEY
Richard J. Hughes Justice Complex
25 Market Street, PO Box 093
Trenton, New Jersey 08625-0093
Attorney for Appellants
(609) 984-5016

Stuart B. Drowos (Bar 427)
Deputy Attorney General
Division of Revenue, Department of Finance
Carvel State Building
820 North French Street, 8th Floor
Wilmington, Delaware 19801

Rachel Jeanne Lehr
John F. Dickinson
New Jersey Deputy Attorneys General
On the Brief

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . -1-

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . -2-

STATEMENT OF THE ISSUES PRESENTED . . . . . . . . . . . . -2-

STANDARD OF APPELLATE REVIEW . . . . . . . . . . . . . . -3-

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . -3-

I.   Statutory Framework . . . . . . . . . . . . . . . . -3-

II.  Statement of the Facts . . . . . . . . . . . . . . . -5-

ARGUMENT

         A PENALTY ACTION IS WELL WITHIN THE POLICE
         POWER OF THE STATE AND IS EXEMPT FROM THE
         AUTOMATIC STAY JUST AS THE LEGISLATIVE HISTORY
         ILLUSTRATES . . . . . . . . . . . . . . . . . . . -11-

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . -23-

# TABLE OF AUTHORITIES

PAGE

### CASES CITED

Brennan v. Poritz, 198 B.R. 445 (D.N.J.1996) . . . . . . . -22-

Brock v. Morysville Body Works, Inc.,
     829 F.2d 383, 388-89 (3d Cir. 1987) . . . . . . . . . -19-

City of New York v. Exxon Corp., 932 F.2d 1020
     (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . -20-

Cournoyer v. Town of Lincoln, 790 F.2d 971
     (1st Cir. 1986) . . . . . . . . . . . . . . . . . . . -20-

Cumberland Farms, Inc. v. Florida Department
     of Environmental Protection, 116 F.3d 16
     (1st Cir. 1997) . . . . . . . . . . . . . . . . . . . -15-

I/M/O Cadgene Family Partnership, 286 N.J. Super. 270,
    279, 669 A.2d 239, 244 (App. Div. 1995) . . . . . . . -4-

In re Cousins Restaurants, Inc., 11 B.R. 521
    (Bankr. W.D.N.Y. 1981) . . . . . . . . . . . . . . . -20-

In re Garay, 89 N.J. 104, 444 A.2d 1107 (1982) . . . . . . -15-

In re Wall Tube & Metal Products Co., 831 F.2d 118
    (6th Cir. 1987) . . . . . . . . . . . . . . . . . . -16-

Matter of Commonwealth Oil Refining Co., 805 F.2d 1175,
    1185-86 (5th Cir. 1986), cert. denied, 483 U.S.
    1005 (1987) . . . . . . . . . . . . . . -16-, -20-, -21-

In the Matter of Fesco Plastics Corp., Inc.,
    996 F.2d 152, 154 (7th Cir. 1993) . . . . . . . . . -21-

Midlantic National Bank v. New Jersey Department
    of Environmental Protection, 474 U.S. 494,
    505, 106 S. Ct. 755, 761-62, 88 L.Ed.2d
    859 (1986) . . . . . . . . . . . . . . . . . -11-, -12-

Northwest Bank Worthington v. Ahlers, 485 U.S. 197,
    206 (1988) . . . . . . . . . . . . . . . . . . . . -21-

Penn Terra Ltd. v. Dept. of Environmental Resources,
    733 F.2d 267 (3d Cir. 1984) . . . . . . . . . . -17--19-

State of New Jersey, Department of Environmental
    Protection v. Madison Industries,
    161 B.R. 363 (D.N.J 1994) . . . . . . . . . . . -3-, -14-

Torwico Electronics, Inc. v. State of New Jersey,
    Department of Environmental Protection
    and Energy, 153 B.R. 24 (D.N.J. 1992) . . . . . . . . -3-

United States v. Nicolet, Inc., 857 F.2d 202,
    210 (3d Cir. 1988) . . . . . . . . . . . . . . -15-, -20-

United States v. Wheeling-Pittsburgh Steel Corp.,
    818 F.2d 1077 (3d Cir. 1987) . . . . . . . . . . . . -19-

Wilner Wood Products Co. v. State of Maine, D.E.P.,
    128 B.R. 1, 3 (D.Me. 1991) . . . . . . . . . . . . . -21-

## STATUTES CITED

11 U.S.C. 362 . . . . . . . . . . . . . . . . . . . . -11-

11 U.S.C. 362(b)(4) . . . . . . . . . . . . . . . . -22-

11 U.S.C. §105 . . . . . . . . . . . . . . . . -2-, -21-

11 U.S.C. §362(a) . . . . . . . . . . . . . -10-, -14-

11 U.S.C. §362(b)(4) . . . . . . . . . . . -14-, -20-

18 U.S.C. §959(b) . . . . . . . . . . . . . . . -12-

28 U.S.C. 1452(a) . . . . . . . . . . . . . . . -14-

28 U.S.C. §1452(a) . . . . . . . . . . . . . . -14-

28 U.S.C. §158 . . . . . . . . . . . . . . . . . . -2-

N.J.S.A. 13:1K-12 . . . . . . . . . . . . . . . . . -4-

N.J.S.A. 13:1K-6 to -13 . . . . . . . . . . . . . -1-

N.J.S.A. 13:1K-8 . . . . . . . . . . . . . . -3-, -4-

N.J.S.A. 58:10-23.11 to -23.24 . . . . . . . . . . . -1-

N.J.S.A. 58:10-23.11 to -23.24(Aa1) . . . . . . . . . -7-

## REGULATIONS CITED

N.J.A.C. 7:26E . . . . . . . . . . . . . . . . . -6-

## OTHER AUTHORITIES

Block, Michael K., Optimal Penalties, Criminal Law and
    The Control of Corporate Behavior, 71 Boston
    University Law Review 395, 397 (1991) . . . . . . . . -16-

## **APPENDIX**

**PAGE**

Complaint of State of New Jersey, Department of
    Environmental Protection v. W.R. Grace . . . . . . . . . 1a

Complaint For Declaratory And Injunctive Relief
    Filed by W. R. Grace v. Bradley M. Campbell et al  . . . . 25a

Memorandum Opinion  . . . . . . . . . . . . . . . . . . . . . . 43a


Order Denying Motion To Dismiss And Issuing
    Declaratory And Permanent Injunctive Relief In
    Favor Of Debtors . . . . . . . . . . . . . . . . . . . . . 55a

Notice Of Appeal  . . . . . . . . . . . . . . . . . . . . . . 59a

<u>PRELIMINARY STATEMENT</u>

This appeal arises from a final decision of the Bankruptcy Court (Hon. Judith K. Fitzgerald, U.S.B.J.) granting W.R. Grace an injunction prohibiting the State of New Jersey, Department of Environmental Protection ("State" or "DEP"), from enforcing the penalty provisions of the Industrial Site Recovery Act ("ISRA"), N.J.S.A. 13:1K-6 to -13, and the Spill Compensation and Control Act ("the Spill Act"), N.J.S.A. 58:10-23.11 to -23.24, by filing a complaint in the Superior Court of New Jersey for violations of ISRA wherein W. R. Grace swore to the truth of false information that it was submitting to the DEP. In seeking, and obtaining, that injunctive relief, Grace asserted that the State's action was only for penalties and therefore not within its police power, but rather within its pecuniary interest.

The Bankruptcy Court, in granting Grace's request for relief, concluded that an action to compel compliance with environmental statutes by assessing penalties for serious violations of ISRA that left residents exposed to asbestos contamination had nothing to do with health and safety, but was merely the enforcement of a money judgment. The result thus reached is incorrect as a matter of law, is unsound as a matter of policy, and should be reversed.

JURISDICTIONAL STATEMENT

This appeal arises under 28 U.S.C. §158 from a final judgment of the Bankruptcy Court.

STATEMENT OF THE ISSUES PRESENTED

1.    Whether the Bankruptcy Court erred in granting W. R. Grace an injunction against the State of New Jersey, Department of Environmental Protection, when debtors had certified to false information as to asbestos contamination present at the debtor's Hamilton, New Jersey, vermiculite exfoliation plant, and had submitted the certification and false information to the Department, finding that a penalty action was not within the police power but only in its pecuniary interest.

2.    Whether the Bankruptcy Court erred in finding that the question it addressed is simply whether the DEP's action violated the automatic stay or is a proper exercise of its police and regulatory power.

3.    Whether the Bankruptcy Court erred in finding that the complaint was a violation of the automatic stay, a decision in opposition to all other case law of this circuit on this subject.

4.    Whether the Bankruptcy Court erred in issuing an injunction under 11 U.S.C. §105 contrary to the caselaw on this section.

- 2 -

STANDARD OF APPELLATE REVIEW

This appeal raises and turns on issues of law, subject to de novo review by this Court. The Bankruptcy Court's legal conclusions are subject to plenary review, and its finding of facts are scrutinized under a clearly erroneous standard. Torwico Electronics, Inc. v. State of New Jersey, Department of Environmental Protection and Energy, 153 B.R. 24 (D.N.J. 1992); State of New Jersey, Department of Environmental Protection v. Madison Industries, 161 B.R. 363 (D.N.J 1994).

STATEMENT OF THE CASE

W.R. Grace ("Grace") operated a Vermiculite processing plant, located in Hamilton Township, Mercer County, New Jersey ("the Plant"). This Plant is an "industrial establishment" as that term is defined in ISRA at N.J.S.A. 13:1K-8.

I. Statutory Framework

ISRA, previously known as the Environmental Cleanup Responsibility Act ("ECRA"), was enacted in 1983 for the purpose of preventing private businesses from forcing the public to bear the expense of cleaning up abandoned plant sites contaminated with hazardous wastes. In order to achieve this goal, ISRA provides that, upon the closure, sale or transfer of an industrial establishment, the owner or operator of the industrial establishment must either submit a cleanup plan to the Department detailing the measures necessary to detoxify the property, or

- 3 -

obtain a "negative declaration" from the Department that there has been no discharge of hazardous substances or wastes or that any such discharge has been cleaned up in accordance with procedures approved by the Department, and that there remain no hazardous substances or wastes on the property. N.J.S.A. 13:1K-8. By the express terms of the statute, compliance with ISRA "constitute[s] [a] continuing regulatory obligation ... imposed by the State." N.J.S.A. 13:1K-12.

The submission of true, accurate and complete documents is the cornerstone of the ISRA program. Indeed, New Jersey's Superior Court, Appellate Division, in reviewing a matter involving blatant misrepresentations, like these, in a Negative Declaration submitted to the Department pursuant to ECRA, said:

> The purpose of ECRA, and now ISRA, is to remedy the "legacy of hazardous waste" left after decades of industrial activity. [citation omitted] The owner or operator of an industrial facility at the time of the transaction triggering the statute is bound by a "self-executing duty to remediate." [citation omitted]. The program is dependent on accurate and complete submissions to DEP by owners and operators.

I/M/O Cadgene Family Partnership, 286 N.J. Super. 270, 279, 669 A.2d 239, 244 (App. Div. 1995).

In sum, most of New Jersey's environmental laws, including ISRA and its predecessor, ECRA, impose self-reporting requirements on the regulated community, and the Department must be able to depend upon the truth of what is reported. There is

- 4 -

nothing more fundamental to the protection of the public health, safety and environment than the submission of truthful and accurate documents by the members of the regulated community.

## II. Statement of the Facts

The Plant was in operation for approximately 44 years (1950 to 1994). For many of those years, the Plant manufactured asbestos-containing insulating material and soil supplements made from a concentrated, asbestos-laden vermiculite ore, primarily mined from Grace's Libby, Montana mine. The insulating material and soil supplements were made by expanding (exfoliating) the concentrated vermiculite ore. Grace also manufactured other asbestos-containing products at the Plant, including, but not necessarily limited to, a fire protection product known as Monokote 1, which, prior to 1970, contained 13 percent asbestos by weight.

Despite the history of asbestos use at the Hamilton Plant, the Preliminary Assessment/Site Investigation ("PA/SI") required by ISRA to be certified to and submitted to the Department essentially declared that no sampling of the soil was necessary because Grace did not use asbestos-containing materials at the Plant. In that regard, Grace represented that the vermiculite processed at the Plant did not have an asbestos content of more than one percent by weight, which is the regulatory threshold for asbestos-containing materials. The

- 5 -

Negative Declaration stated that any hazardous substances that had been discharged at the Plant had been remediated in accordance with the Department's Technical Requirements for Site Remediation, N.J.A.C. 7:26E. Both the PA/SI and the Negative Declaration were certified by Robert Bettacchi and Jay A. Burrill, who were Grace employees at the time, as accurate.

Grace closed the Plant in 1994, triggering ISRA. Thus, it was incumbent upon Grace to conduct a PA and an SI for the Hamilton Plant, and if necessary, a Remedial Investigation ("RI"). If an RI was necessary and revealed the existence of hazardous substances or hazardous wastes at the Hamilton Plant, Grace was required to prepare a Remedial Action Work Plan ("RAWP") and to submit it to the Department for approval and eventual implementation.

As a result of the representations made by Grace and certified by Bettacchi and Burrill, the Department issued No Further Action letters, which meant no cleanup was necessary, for the Plant in August and November 1995. Nothing further occurred at the Plant until the United States Environmental Protection Agency ("EPA") began to investigate certain vermiculite exfoliation plants across the United States that had received large amounts of concentrated vermiculite ore from the Libby, Montana mine. In or about October 2000, the USEPA sampled the Plant and its surroundings. An analysis of soil samples revealed

- 6 -

significant concentrations of asbestos in the soil at the Plant and its environs. Though the EPA sampling took place in 2000, the Department did not become aware of the contamination until in or about the Fall of 2003, when it was asked by the New Jersey Department of Health and Senior Services to comment on a draft health assessment for the Plant. At that time, DEP representatives were unaware that the Plant referred to in the health assessment had previously been in the ISRA program, because the health assessment referred to the Plant as the "Zonolite" plant. DEP had no such plant in its data base. By 2003, the extent of the contamination, which in some samples was as high as 40 percent by weight, was delineated and excavation activities began. Approximately 15,000 tons of asbestos-contaminated soil have been removed from the Plant environs. Amtrak Corporation and American Premier Underwriters Inc., took the lead in the necessary remediation, a fact that the Bankruptcy Court thought made a difference to its decision, which it should not have at all.

On June 1, 2005, the Department filed suit against W.R. Grace & Co. and W.R. Grace Co.-Conn. ("Grace"), Bettacchi, and Burrill (collectively, "Defendants") seeking civil penalties pursuant to ISRA and the New Jersey Spill Compensation and Control Act ("Spill Act"), N.J.S.A. 58:10-23.11 to -23.24(Aa1)*. The State action seeks civil penalties against the Defendants for false

---

* "Aa" cites are to Appellant's Appendix.

- 7 -

statements and misleading information contained in the PA/SI and the Negative Declaration filed with the Department. By the time Grace's violations of the law were discovered by the State, the bar date for filing a proof of claim, which had been March 31, 2003, had passed.

On September 19, 2005, W.R. Grace filed a complaint in the Bankruptcy Court for Declaratory and Injunctive Relief, clearly giving all involved with the bankruptcy notice of the action against Grace in State court (Aa25). During oral argument at a hearing on November 14, 2005, on the adversary proceeding, counsel for Grace maintained that Grace would seek to have the Bankruptcy Court adjudicate this penalty. In addition, at this same time the Court issued a temporary stay on the State's action. Almost the entire argument by Grace on November 14, 2005, was an attempt to convince the Court that an action to assess a penalty for supplying false information to the Department was not a police power action, which of course it is. The Court did not decide the issue on November 14, 2005, but temporarily stayed the State action and asked the parties to discuss settlement for a few months and then come back. On September 19, 2005, the State court action had been removed, we believe improperly, to Federal District Court, something that cannot be done in relation to a police power action. On October 6, 2005, the State filed a motion to remand in the District Court of New Jersey, and Grace filed a

- 8 -

motion to transfer the case to the Delaware Bankruptcy Court, on October 3, 2005.

The debtor failed both to truthfully acknowledge the historic operations at the Plant in its false report, and it failed to sample for the presence of asbestos at the Plant, deciding instead to present and certify to a misleading picture of the site operations and conditions. These misrepresentations caused the Department to issue "no further action" letters that allowed the debtors to move on without disclosing that the Plant was seriously contaminated with asbestos.

Simply put, the debtor had certified under oath to the following on two different documents that allowed it to obtain no further action letters from the Department, and left residents exposed to asbestos contamination:

> I certify under penalty of law that I have personally examined and am familiar with the information submitted herein and all attached documents, and that, based on my inquiry of those individuals immediately responsible for obtaining the information, I believe that the submitted information is true, accurate and complete. I am aware that there are significant civil penalties for knowingly submitting false, inaccurate or incomplete information, and that I am committing a crime of the fourth degree if I make a written false statement which I do not believe to be true. I am also aware that if I knowingly direct or authorize the violation of any statute I am personally liable for the penalties.

The Bankruptcy Code should not provide a haven for debtors from the consequences of submitting false documents to a governmental entity. As demonstrated below, the Bankruptcy

- 9 -

Court's conclusion that actions to enforce environmental laws are not "state police actions" subject to express exclusion from the automatic stay provisions of 11 U.S.C. §362(a), but rather are actions to collect "money judgments," is contrary to the law of this Circuit, and contrary to plain usage.   The decision below should be reversed. On April 1, 2008, the Bankruptcy Court issued its Memorandum Opinion enjoining the appellants from taking any action against W.R. Grace (Aa42) and it Order Denying Motion to Dismiss and issuing Declaratory And Permanent Injunctive Relief In Favor of Debtors (Aa54).   On April 8, 2008, appellants filed this appeal (Aa57).

ARGUMENT

A PENALTY ACTION IS WELL WITHIN THE
POLICE POWER OF THE STATE AND IS
EXEMPT FROM THE AUTOMATIC STAY
JUST AS THE LEGISLATIVE HISTORY
ILLUSTRATES.

Nothing could be more within the police power of the State than to punish a violator of the law. The legislative history of Section 362(b)(4) of the Bankruptcy Code, 11 U.S.C. 362(b)(4) explains the purpose of the latter exception:

> Paragraph (4) excepts commencement or continuation of actions and proceedings by governmental units to enforce police or regulatory powers. Thus, where a governmental unit is suing a debtor to prevent or stop violation of fraud, <u>environmental protection</u>, consumer protection, safety, or similar police or regulatory laws, <u>or attempting to fix damages for violation of such law, the action or proceeding is not stayed under the automatic stay.  [S. Rep. No. 95-989 at 52, 1978 U.S. Code Cong. & Admin. News at 6299.</u> (Emphasis added).]

There it is right up front in the legislative history, damages. Just the opposite of the opinion below, which is entirely wrong and must be reversed.  The legislative record emphasizes that "[b]etween 1973 and 1978, some courts had stretched the expanded automatic stay to foreclose the State's efforts to enforce their antipollution laws and Congress wanted to overrule these interpretations in its 1978 revision." <u>Id</u>. at 6134-6136.  In the face of the greatly increased scope of §362, Congress decided to impose express limits on the stay provisions.  <u>See</u> <u>Midlantic</u>

- 11 -

National  Bank  v.  New  Jersey  Department  of  Environmental
Protection, 474 U.S. 494, 505, 106 S. Ct. 755, 761-62, 88 L.Ed.2d
859 (1986).

More  than  two  decades  ago,  the  Supreme  Court  in
Midlantic Nat'l Bank, supra, recognized the critical importance
Congress  assigned  to  the  "goal  of  protecting  the  environment
against toxic pollution." 474 U.S. at 505. The concern as it has
been repeatedly expressed by Congress is that "the trustee is not
to have carte blanche to ignore nonbankruptcy law." 474 U.S. at
505. "Congress did not intend for the Bankruptcy Code to pre-empt
all state laws." Ibid.  This Congressional intent is reflected in
Section 959(b) of the Code, 18 U.S.C. §959(b) which commands the
trustee to "manage and operate the property in his possession ...
according to the requirements of the valid laws of the State."
Ibid.  Penalties are an essential part of the scheme envisioned by
Congress, because they are a necessary part of "the valid laws of
the State" since they provide a meaningful way of deterring
violation of those laws.  To prevent the State from filing this
claim goes against all the intentions of Congress not to make
bankruptcy court a haven for wrongdoers.

Contrary to the Bankruptcy Court decision, the State
action was initiated to penalize Grace for what the Department
believes were blatant misrepresentations in the PA/SI report and
the Negative Declaration.  Those misrepresentations led to a

- 12 -

threat to the public health, safety and environment that lasted almost 10 years. Dishonesty in any submission means that the Department may be unaware of adverse environmental conditions and exposure scenarios that negatively impact upon public health and safety. That is particularly true here because Grace's operation of the Plant involved the manufacture of asbestos-containing products. Asbestos is an extremely dangerous substance. The intake of airborne asbestos fibers causes asbestosis and other crippling lung diseases and often leads to death. Thus, it was extremely important for Grace to have accurately advised the Department of the nature of its operations at the Plant, which occurred for almost 50 years, and the extent of any possible asbestos contamination. The importance of that task is evident from the fact the Plant was surrounded by residential communities. Additionally, a document shredding business leased the Plant after the Department issued No Further Action letters based on Grace's PA/SI report and its Negative Declaration for the Plant.

The State action was initiated not to protect any pecuniary interest the State may have in Grace's property, but to deter Grace and companies like Grace and their responsible officers and employees from endangering the health and safety of the citizens of New Jersey through the submission of false or misleading documents to the Department. Cost recovery litigation has been found to be exempt from the automatic stay, thus, to say

that a penalty action is not does not make sense.  The Bankruptcy Court decision must be reversed.

The State civil penalty action falls within the clear and unambiguous language of the police power exemption from the automatic stay provision of 11 U.S.C. §362(a) provided by 11 U.S.C. §362(b)(4) of the Bankruptcy Code and the exclusion to the removal provisions of 28 U.S.C. 1452(a).  As such, the State penalty action is not subject to removal pursuant to 28 U.S.C. §1452(a).  Accordingly, the Grace defendants' removal of the State penalty action to Federal Court was improper, and the State penalty action should be remanded to the New Jersey Superior Court, Law Division.

The deterrence value of penalties is a necessary aspect of the enforcement of environmental laws.  Virtually every site remediation law has penalty provisions to deter ongoing contamination and the refusal to clean up existing contamination. Statutes imposing cleanup obligations on private parties are effective precisely because they impose substantial penalties on those who do not comply.  Thus, as Chief Judge Garrett E. Brown, Jr., of the District of New Jersey has ruled, "statutory penalties 'give teeth' to environmental laws."  State of New Jersey, Department of Environmental Protection v. Madison Industries, Inc., 161 B.R. 363, 366 (D.N.J. 1993).  In order to deter violations effectively, penalties must impose a greater expense

- 14 -

upon the violator than the cost of operating within the law.  This becomes even more important when the operator is under financial pressure that increases the temptation to avoid the expenditures required to comply with the law.

The caselaw on penalties is legion and usually deals with whether they should be paid as an administrative expense or not, but in none of this caselaw is it suggested that assessing a penalty or litigating to fix the penalty is a violation of the automatic stay.  See <u>United States v. Nicolet, Inc.</u>, 857 F.2d 202, 210 (3d Cir. 1988) (holding that the entry of a money judgment, even without enforcement of that judgment, interjects "a valuable deterrence element" into a statutory scheme, making it plain that such actions fall within the category related to police or regulatory powers of the State); <u>In re Garay</u>, 89 N.J. 104, 444 A.2d 1107 (1982) (finding by the New Jersey Supreme Court that an action to fix damages for violation of medicaid fraud statutes was not stayed by physician's filing of petition for bankruptcy); <u>Cumberland Farms, Inc. v. Florida Department of Environmental Protection</u>, 116 F.3d 16 (1st Cir. 1997) (finding no compelling basis existed for reducing $200,000 penalty assessed by bankruptcy court for debtor's violation of Florida's environmental protection laws; and penalty was properly accorded administrative expense status).

- 15 -

The best-known way of enforcing laws to protect the public health and safety is through the assessment of penalties. A debtor's legal obligations to society as a whole should not be subordinated to the particular interest of his creditors. <u>See</u>, Cordry, Karen, <u>Debtor's Obligation to Obey The Law And The Government's Role in Bankruptcy Courts</u>, National Association of Attorneys General, Washington, D.C. (1994).

Further, optimal penalty theory requires that fines be set at a level that fully reflects the costs to society of a prohibited activity engaged in by an economic agent -- either an individual or a firm. Society must impose penalties on these entities, because, otherwise, these entities would force society to bear the cost of the harms that result from their engaging in a prohibited activity. Block, Michael K., <u>Optimal Penalties, Criminal Law and The Control of Corporate Behavior</u>, 71 <u>Boston University Law Review</u> 395, 397 (1991). Optimal fines force economic agents to internalize the total cost of their activities. <u>See also Matter of Commonwealth Oil Refining Co.</u>, 805 F.2d 1175, 1185-86 (5th Cir. 1986), <u>cert. denied</u>, 483 U.S. 1005 (1987) ("the Supreme Court itself characterized the automatic stay provision as designed to overrule judicial expansion of the automatic stay that was 'foreclose[ing] States' efforts to enforce their antipollution laws'"); <u>In re Wall Tube & Metal Products Co.</u>, 831 F.2d 118 (6th Cir. 1987) (holding that a liquidating debtor was required to

comply with state environmental laws; noting that "any discussion
of this question of administrative expenses ... and ... hazardous
wastes must begin with Midlantic").

In light of the broad exemption for governmental
enforcement actions provided in the Bankruptcy Code's automatic
stay provisions, and in view of the legislative history behind
section 362(b)(4), courts have repeatedly held that actions, like
this one, involving the enforcement of environmental laws and
regulations at hazardous waste sites are not subject to the
automatic stay. The leading case on this point in this Circuit is
Penn Terra Ltd. v. Dept. of Environmental Resources, 733 F.2d 267
(3d Cir. 1984).

In Penn Terra, a debtor filed for protection in
bankruptcy after having failed to comply with environmental
regulations governing the operation of the debtor's coal mines in
Pennsylvania, and after having violated the terms of a consent
order under which the debtor had agreed to correct violations of
the Commonwealth's environmental statutes. When the Commonwealth
of Pennsylvania sought to enforce the environmental laws and the
terms of the consent order, the debtor (Penn Terra) moved to
restrain the State in Bankruptcy Court, arguing that
Pennsylvania's enforcement action violated the automatic stay
provisions of Section 362(a). The debtor argued that, while cast
as an action for enforcement of the Commonwealth's environmental

- 17 -

laws, the Commonwealth's action was, in light of the disparity between the costs and the funds available to do the remedial work, actually an attempt to collect a money judgment from the debtor. The Bankruptcy Court agreed with the debtor's characterization of the Commonwealth's action and, on appeal, the District Court affirmed.

On appeal from the District Court, however, the Third Circuit reversed. The Third Circuit noted that the legislative history of Section 362(b)(4) made clear Congress's intent to exempt the state's enforcement of environmental laws from the operation of the automatic stay. Moreover, the court (anticipating, it would seem, the Supreme Court's later decision in Midlantic) noted that federal statutes should not be construed to preempt state regulations under the police power unless there is an unmistakable indication from Congress that it intended to abrogate such powers. 733 F.2d at 273.

The Third Circuit also rejected the debtor's argument that Pennsylvania's enforcement of the state's environmental laws was, in fact, an attempt to enforce a money judgment, and therefore subject to the operation of the automatic stay. The court looked to the traditional understanding of a money judgment and found that it consisted of two elements:    (1) an identification of the parties for and against whom judgment was being entered; and (2) a definite and certain designation of the

amount that is owed.  The court pointed out that, under
established case law, "an important factor in identifying a
proceeding as one to enforce a money judgment is whether the
remedy would compensate for _past_ wrongful acts resulting in
injuries already suffered, or protect against potential _future_
harm." 733 F.2d at 276-77 (emphasis in original).  The court
noted:

> the Commonwealth Court's injunction was meant
> to prevent future harm to, and to restore, the
> environment.  Indeed, examining the state
> order, it is clear that erosion control, back-
> filling, and reseeding were additionally meant
> to preserve the soil conditions from further
> deterioration (as well as rectify a safety
> hazard). [_Id._ at 278.]

Because the Commonwealth's injunction was intended to prevent
future harm, the court concluded that the injunction was not a
money judgment.

Decisions since _Penn Terra_ have confirmed that
government enforcement actions for violations of environmental
laws are not subject to the automatic stay provisions of §362(a)
-- even in cases where compliance requires the expenditure of
money.  See _Brock v. Morysville Body Works, Inc._, 829 F.2d 383,
388-89 (3d Cir. 1987) (enforcing OSHA citation ordering abatement
of health and safety hazards and requiring debtor to spend money
to do so exempt from automatic stay pursuant to 11 U.S.C.
§362(b)(4)); _United States v. Wheeling-Pittsburgh Steel Corp._, 818
F.2d 1077 (3d Cir. 1987) (bankruptcy did not relieve debtor of

- 19 -

obligation to install pollution control equipment and action under Clean Air Act was exempt from automatic stay pursuant to 11 U.S.C. 362(b)(4)); Cournoyer v. Town of Lincoln, 790 F.2d 971 (1st Cir. 1986) (state court order to remove scrap metal from site enforceable in bankruptcy court and exempt from automatic stay pursuant to 11 U.S.C. §362(b)(4)); United States v. Nicolet, Inc., 857 F.2d 202 (3d Cir. 1988) (automatic stay does not apply to CERCLA cost recovery action); Matter of Commonwealth Oil Refining Co., 805 F.2d 1175 (5th Cir. 1986), cert. denied, 483 U.S. 1005 (1987) (holding RCRA obligations not to be subject to automatic stay and to be enforceable even when there is no imminent and identifiable harm, and even when compliance requires the expenditure of money); City of New York v. Exxon Corp., 932 F.2d 1020 (2d Cir. 1991) (cost recovery actions under CERCLA not subject to automatic stay); In re Cousins Restaurants, Inc., 11 B.R. 521 (Bankr. W.D.N.Y. 1981) (finding town's action to enforce zoning requirement to be exempt from automatic stay pursuant to 11 U.S.C. §362(b)(4)).

The Bankruptcy Court, in its opinion below, not only failed to adhere to the Third Circuit's decisions in Penn Terra, Brock, and Wheeling-Pittsburgh, but Midlantic and Penn Terra and the other above-cited cases make clear that enforcement actions under ISRA and other environmental laws are exercises of the State's police power that fall squarely within the exemption of 11

- 20 -

U.S.C. §362(b)(4), and the Bankruptcy Court's contrary conclusion below should be reversed.

So too, did the court below err in issuing an injunction under Section 105, 11 U.S.C. §105, of the Bankruptcy Code. Section 105 is not an unrestricted grant of authority to bankruptcy courts to exercise their personal view of the equities of a particular situation. Rather, the authority is granted to the courts to supplement and enforce the existing policies of the Code, not to supplant or contradict them. See e.g., Northwest Bank Worthington v. Ahlers, 485 U.S. 197, 206 (1988) (finding that whatever equitable powers the Bankruptcy Court has can only be exercised within the confines of the Bankruptcy Code to further its policies, not to contravene them); Matter of Commonwealth Oil Refining Co., 805 F.2d 1175, 1188 n.16  (5th Cir. 1986), cert. denied, 483 U.S. 1005 (1987) (denying an injunction to prevent EPA enforcement act because §105 "does not authorize the bankruptcy court to create substantive rights that are otherwise unavailable under applicable law or constitute a roving commission to do equity"); In the Matter of Fesco Plastics Corp., Inc., 996 F.2d 152, 154 (7th Cir. 1993) (court may exercise its equitable powers only as a means to implement some specific Code provision); Wilner Wood Products Co. v. State of Maine, D.E.P., 128 B.R. 1, 3 (D.Me. 1991) ("That statute does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under

- 21 -

applicable law," finding that §105 did not give the court the
authority to enjoin enforcement of the state's environmental laws,
even temporarily, when they burden debtor's reorganization
efforts); Brennan v. Poritz, 198 B.R. 445 (D.N.J.1996)(finding
that debtor's need for breathing spell to effectuate orderly
reorganization was not sufficient reason for bankruptcy court to
invoke its general equitable powers to enjoin state regulatory
proceeding, which was civil action against debtor alleging
securities fraud and racketeering activity, and which would
otherwise be excepted from the automatic stay as continuation of
action by governmental unit to enforce its police or regulatory
powers. 11 U.S.C. 362(b)(4); "Grant of injunctive relief is
extraordinary remedy that should be granted only in limited
circumstances."). The injunctive issued by the Bankruptcy Court
does not meet these qualifications at all.

As the foregoing lengthy list indicates, the Bankruptcy
Court's decision below is contrary to established law. The
decision below should be reversed.

<u>CONCLUSION</u>

For the foregoing reasons, the decision of the Bankruptcy Court should be reversed, and the Department of Environmental Protection should be permitted to enforce its environmental laws against W.R. Grace.

Respectfully submitted,

ANNE MILGRAM
ATTORNEY GENERAL OF NEW JERSEY

By: <u>/S/Rachel Jeanne Lehr</u>
Rachel Jeanne Lehr
Deputy Attorney General

<u>/S/ Stuart B. Drowos</u>
Stuart B. Drowos (Bar 427)
Deputy Attorney General
Division of Revenue
Department of Finance
Carvel State Building
820 North French Street, 8th Floor
Wilmington, Delaware 19801

Local Counsel for Appellants

DATED: June 19, 2008

- 23 -

# A P P E N D I X

PETER C. HARVEY
ATTORNEY GENERAL OF NEW JERSEY
Richard J. Hughes Justice Complex
25 Market Street
PO Box 093
Trenton, NJ 08625-0093
Attorney for Plaintiff

By: John F. Dickinson, Jr.
Deputy Attorney General
(609) 984-4654

JUN 01 2005

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - MERCER COUNTY
DOCKET NO. L 1473-05

|  |  |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, | Civil Action |
| Plaintiff, | COMPLAINT |
| v. | |
| W.R. GRACE & CO., INC., a corporation of the State of Delaware; W.R. GRACE & CO.-CONN., a corporation of the State of Connecticut; GRACE-CONN. SUCCESSOR (a fictitious entity); JAY H. BURRILL; and ROBERT J. BETTACCHI, | |
| Defendants. | |

Plaintiff New Jersey Department of Environmental Protection ("DEP")("the Plaintiff"), having its principal offices at 401 East State Street in the City of Trenton, County of Mercer, State of New Jersey, by way of Complaint against the above-named defendants (collectively, "the Defendants"), says:

001a

## STATEMENT OF THE CASE

1.    The Plaintiff brings this civil action pursuant to the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 to -23.24 ("the Spill Act"), and the Industrial Site Recovery Act, N.J.S.A. 13: 1K-6 et seq. ("ISRA"), for civil penalties for misrepresentations and false statements made in a Preliminary Assessment/Site Investigation ("PA/SI") Report and Negative Declaration submitted by the Defendants to the DEP in 1995 pursuant to ISRA.

## THE PARTIES

2.    Plaintiff is a principal department within the Executive Branch of the State Government vested with the authority to conserve natural resources, protect the environment, prevent pollution, and protect the public health and safety.    N.J.S.A. 13:1D-9.

3.    Defendant, W. R. Grace & Co.-Conn ("Grace-Conn."), is a corporation of the State of Connecticut.    Grace-Conn. and its predecessor, W.R. Grace and Co., Inc. ("original W.R. Grace"), formerly a corporation of the State of Connecticut, operated a vermiculite processing plant at 35 Industrial Drive in Hamilton Township, Mercer County, New Jersey ("Hamilton Plant") during the times alleged in this complaint.    Grace-Conn. and the original W.R.

- 2 -

Grace hereinafter collectively will be referred to as "Grace," unless otherwise referenced.

4. Defendant Grace-Conn. Successor, a fictitious entity, is the successor in interest to Grace-Conn.

5. Defendant W.R. Grace & Co., Inc. ("W.R. Grace and Co.") a corporation with offices in Columbia, Maryland, is the parent corporation of both Grace-Conn. and Grace-Conn. Successor. At all times referred to in this Complaint, Defendant W.R. Grace & Co. or its predecessor or predecessors in interest controlled the operations of Defendants Grace-Conn. and Grace-Conn. Successor.

6. Defendant Jay H. Burrill is an individual whose dwelling or usual place of abode is unknown. At the time the PA/SI Report and the Negative Declaration described below were submitted to the DEP, Defendant Burrill was an Environmental Coordinator for Grace-Conn. In that capacity, Defendant Burrill oversaw Grace-Conn.'s environmental compliance activities at the Hamilton Plant.

7. Defendant Robert J. Bettacchi is an individual whose dwelling or usual place of abode is unknown. At the time the PA/SI Report and Negative Declaration described below were submitted to the DEP, Defendant Bettacchi was President of Grace Construction Products, a division of Grace-Conn., and Vice President of Defendant Grace-Conn. Defendant Bettacchi is a former Senior Vice President of the Defendant W.R. Grace & Co., and a former President of Grace Performance Chemicals, a unit of Defendant W.R. Grace &

- 3 -

003a

Co.  In his capacity as President of Grace Construction Products and Vice President of Grace-Conn., Defendant Bettachi was responsible for the overall operation of the Hamilton Plant.

### ALLEGATIONS

8.    The Hamilton Plant was situated on a parcel approximately 8.4 acres in size, comprising two lots identified on the Tax Map of Hamilton Township, Mercer County, New Jersey as Block 1581, Lots 19.01 and 19.02 (the "Site"). Lot 19.01, is 4.24 acres in size and is owned by MLB Properties, L.L.C., and Block 1581, Lot 19.02, is 4.17 acres in size and is owned by National Railroad Passenger Corporation, Inc. ("Amtrak").

9.    The Site formerly was identified as Block 46, Lot 3 on the Tax Map of Hamilton Township, Mercer County, New Jersey.  The Hamilton Plant has had several addresses, including 10 Industrial Drive, 15 Industrial Drive, 31 Industrial Drive, 35 Industrial Drive and 336 Whitehead Road.

10.    Amtrak Corporation ("Amtrak") and its predecessors-in-interest, the Pennsylvania Railroad ("PRR"), and Penn Central Transportation Corporation ("Penn Central"), owned the Site from approximately 1948 until approximately 1999 when Block 46, Lot 3 was subdivided and re-designated as Block 1581, Lot 19.01 and Block 1581, Lot 19.02.  Amtrak still owns Block 1581, Lot 19.02.

11.    From 1950 to 1963, the Zonolite Corporation ("Zonolite") operated a plant at the Site under a lease with PRR. Zonolite

- 4 -

manufactured vermiculite-based products such as structure fireproofing materials, thermal insulation for masonry products, lightweight concrete aggregate, and horticultural vermiculite.

12. In 1963, Grace's predecessor, Original W.R. Grace, purchased the Zonolite Corporation and Grace began to process vermiculite concentrate at the Site under a lease with PRR and later Penn Central. Grace manufactured essentially the same vermiculite-based products at the Site as did Zonolite.

13. The raw vermiculite concentrate processed at the Site primarily came from Grace's mine in Libby, Montana ("Libby mine"). Some concentrate from Grace's South Carolina mine also was used.

14. The raw vermiculite ore was milled into a substance known as "vermiculite concentrate" at the Libby mine. The vermiculite concentrate contained tremolite asbestos in varying concentrations.

15. Grace's operations at the Site included, but were not limited to, the expansion of raw vermiculite concentrate. The expansion of the raw concentrate was accomplished by heating the raw concentrate in a kiln at a temperature of 2,000 degrees, which expanded the material 10 or 15 times its original size.

16. The vermiculite expansion process conducted at the Site produced waste that contained high concentrations of amphibole asbestos. Two primary types of waste were produced at the Site, "Stoner Rock," which was raw vermiculite ore that did not expand,

- 5 -

and baghouse fines, which were collected as a dust particle in the furnace vent system.

17.  Some of the waste referenced in paragraph 16 was disposed of at the Site.

18.  On or about May 13, 1980, Grace submitted a "Selected Substance Report" to the Plaintiff. In section 15 of that report, Grace responded to a request for information for its on-site and off-site plant waste disposal practices for the years 1930-1977. In its response, which was certified as "true, complete, and correct," by Frederick W. Eaton, Grace's then Environmental Coordinator, Grace advised that Grace had disposed of asbestos-containing wastes, but that the location of the disposal sites were unknown. Grace further advised that asbestos-containing waste was in the form of "mixed floor sweeping waste," and that "prior to 1972, this facility manufactured a fire proofing material containing 13% (by weight) commercial asbestos."

19.  In the Community Right to Know Survey for 1989 submitted by Grace to Plaintiff for the Site pursuant to the Emergency Planning and Community Right to Know Act ("EPCRA"), 42 U.S.C.A. § 11001 et seq., and the New Jersey Community Right to Know Act ("NJCRA"), N.J.S.A. 34:5A-1 et seq., among other things, Grace advised that it stored "Asbestos-Process Waste Vermiculite." at the Site.  Grace inserted Chemical Abstract Services ("CAS") number 1332-21-4, and Department of Transportation ("DOT") number of 2590,

- 6 -

006a

in the entry for the waste.  Those numbers are used to designate
asbestos materials.

20.  In its 1989 Right to Know Survey referenced in paragraph
19 above, Grace inserted "percent code" number 52, which indicates
that the waste contained from 1 to 9% asbestos and "hazard codes"
of 66 and 67, which respectively indicate that the waste posed a
"delayed(chronic) health hazard," and an "immediate (acute) health
hazard."  Grace also advised that "process waste vermiculite
(Libby)" and "process waste vermiculite (SC)" were stored at the
Site.  The entry for the Libby waste indicates that waste was a
mixture and had the "hazard codes" 66 and 67.  The entry for the
"SC" waste also indicated that it was a mixture and that it had a
"hazard code" of 66.  The 1989 Survey was certified as "true,
accurate, and complete" by Tim W. Carrothers, Plant Manager.

21.  In the Community Right to Know Survey for 1991 submitted
by Grace to plaintiff for the Site pursuant to EPCRA and NJCRA,
among other things, Grace advised that it stored "Asbestos-Process
Waste Vermiculite" at the site.  Grace inserted CAS number 1332-21-
4, DOT number 2590, and Substance Number 0164 in the entry for the
waste.  Those numbers are used to designate asbestos materials.

22.  In its 1991 Right to Know Survey, Grace inserted "percent
code" number 52, which indicated that the waste contained from 1 to
9% asbestos, and "hazard codes" of 66 and 67, which respectively
indicate that the waste posed a "delayed(chronic) health hazard,"

- 7 -

and an "immediate (acute) health hazard." Grace also advised that "process waste vermiculite (SC)" was stored at the Site. The entry indicated that the waste was a mixture and had a "hazard code" of 66, which indicates that the waste posed a "delayed (chronic) health hazard." The 1991 Survey was certified as "true, accurate, and complete" by John S. Kozarovich, Plant Manager.

23.    In the Community Right to Know Survey for 1992 and 1993 submitted by Grace to Plaintiff for the Site pursuant to the EPCRA and NJCRA, among other things, Grace advised that "process waste vermiculite (SC)" was stored at the Site. The entry for that waste indicated that the waste was a mixture and had the "hazard codes" 66 and 67, which respectively indicate that the waste posed a "delayed (chronic) health hazard," and an "immediate (acute) health hazard." The Surveys were certified as "true, accurate, and complete by John S. Kozarovich, Plant Manager.

24.    Grace ceased operations at the Site in January 1994.

25.    Under a cover letter from its attorneys Pitney, Hardin, Kipp, and Szuch dated November 9, 1994, pursuant to ISRA, Grace-Conn submitted a General Information Notice ("GIN") to the DEP. In that letter, Grace-Conn advised that operations at the Site had ceased in January 1994, triggering ISRA, and that Grace-Conn expected to make an ISRA filing in June 1995 when its lease expired. Grace-Conn advised that its had contracted with an

- 8 -

environmental consultant, ERM, Inc., to perform a preliminary assessment for the Site.

26. In October 2000, the United States Environmental Protection Agency ("USEPA") collected soil samples at the Site and in the surrounding areas. Those samples were found to contain tremolite asbestos in concentrations of up to 2.9% and chrysotile asbestos in concentrations of up to 3.9%.

27. Follow-up sampling conducted by USEPA in March 2001 on the plant property and on an adjacent parcel owned by Amtrak known as the "Millham Yard" revealed the presence of tremolite asbestos in the soil in concentrations of up to 4.5% and chrysotile asbestos in concentrations of up to 2.7%. Sampling by USEPA in August 2001 detected the presence of tremolite/actinolite and/or chrysotile asbestos in the soil in concentrations as high as 40%.

28. In 2003, Amtrak and American Premier Underwriters, Inc. ("APU"), as a successor to Penn Central, executed an Administrative Order on Consent with the USEPA wherein they agreed to conduct the remediation of the Site under the oversight of the USEPA.

29. In 2003-2004, under the supervision of the USEPA, Amtrak and APU excavated and disposed of 9,000 tons of asbestos contaminated soil from the Site and environs.

30. In the summer of 2005, it is anticipated that Amtrak and APU will excavate an additional 6,000 tons of contaminated soil under the supervision of the USEPA.

- 9 -

## SPECIFIC ALLEGATIONS-PA/SI REPORT

31.  Under cover letter from its attorney dated June 5, 1995, Grace-Conn submitted a PA/SI Report dated May 19, 1995.  The report, which was prepared by Grace-Conn's environmental consultant, ERM, Inc., included a Negative Declaration for the Site.  Both the PA/SI Report and the Negative Declaration were certified as true and correct by Defendants Burrill and Bettachi on June 2, 1995.

32.  In the PA/SI Report, Grace-Conn identified several Areas of Concern ("AOC") at the Site where waste from Grace-Conn's on-site vermiculite processing activities could have come to be located.  Those AOCs were identified in the report as: "Silos"; "Rail Spurs or Sidings"; "Rail/truck loading and unloading areas"; "Storage pads and areas including drum and/or waste storage"; three "dumpsters"; "Areas of stressed vegetation"; "Discolored areas or spill areas" and "Loading or transfer areas."

33.  In its PA/SI report, Grace-Conn indicated that prior to 1970, it formulated a fire protection product known as "Monokote" at the site that contained chrysotile asbestos.  The material that Grace-Conn used to manufacture the "Monokote" contained 13% commercial asbestos by weight.

34.  In the PA/SI Report, Grace-Conn advised that it did not sample the "silo"/"storage pads and areas including drum and/or waste storage" AOCs because: "no known spills or discharges from

010a

the silos have occurred; the silos were located on an impervious concrete pad; trace amounts of asbestos were present in only a percentage of the raw material used on site prior to 1993; and the raw [vermiculite] material was treated to prevent any releases of asbestos."

35. In the PA/SI Report, Grace-Conn advised that it did not sample the "rail spur or siding"/"rail truck loading and unloading"/"loading or transfer" AOCs because: "limited amounts of vermiculite are present along the tracks; however, vermiculite is not considered to be a hazardous substance; trace amounts of asbestos were present in only a percentage of the raw material used on site prior to 1993; and the raw [vermiculite] material was treated to prevent any releases of asbestos." Additionally, as to the "truck loading/unloading area" and the "loading or transfer" AOCs, Grace-Conn advised that it did not sample those areas "[b]ecause no known spills or discharges have occurred in the truck loading area and this area is paved."

36. In the PA/SI report, Grace-Conn advised that the dumpsters were the repository for dust generated and collected during the vermiculite expansion process conducted at the site. Grace-Conn further advised in the PA/SI that the dumpster areas were not sampled "[b]ecause no known environmental problems have been associated with the dumpsters."

- 11 -

37.  In the PA/SI Report, Grace-Conn advised that it did not sample the "stressed vegetation"/"discolored areas or spill" AOCs to test for asbestos contamination because: "limited amounts of vermiculite are present along the tracks; however, vermiculite is not considered to be a hazardous substance; trace amounts of asbestos were present in only a percentage of the raw material used on site prior to 1993; and the raw [vermiculite] material was treated to prevent any releases of asbestos." Additionally, Grace-Conn advised that a trailer storage area located within these AOCs had dark-colored areas on the ground, but that it did not sample those areas because "these areas are probably due to normal trailer operations."

38.  Grace-Conn sought to justify its failure to sample the AOC's identified in the PA/SI Report on seven separate occasions in the report on the basis that "the vermiculite present on-site cannot be viewed as an asbestos-containing material because of the following:  (1)  the asbestos-containing Montana vermiculite concentrate comprised only a percentage of the total concentrate stored on-site; use of the Montana vermiculite was less than 10% from 1991 to 1992 and was discontinued in 1993; and (3) less than 1% of asbestos would be present in the vermiculite concentrate."

39.  In each of the seven instances the purported justification referenced in paragraph 38 above was based on the assertion that the vermiculite concentrate used at the site came

- 12 -

012a

from Montana and South Carolina mines, and that the South Carolina vermiculite concentrate contained no asbestos and had a small mesh size, while the Montana vermiculite concentrates contained only trace amounts (0.3-1% by weight) of tremolite asbestos. Grace-Conn also repeatedly asserted that the Montana vermiculite concentrate had been treated with a vegetable oil dust suppressant that was said to significantly reduced the potential for the transmission of airborne asbestos fibers.

40.   In the site investigation portion of the PA/SI report, Grace-Conn advised that:

> a limited number of areas of concern were identified and
> inspected in accordance with the technical requirements
> (N.J.A.C. 7:26E).   These areas were chosen based upon
> visual observations and in compliance with the New Jersey
> Department of Environmental Protection (NJDEP) technical
> requirements.

As reported in the PA/SI, the areas selected for inspection were the product elevator pits, the water line access pit, the sewage sump, and the driveway drain. None of the areas of concern Grace-Conn identified in the PA/SI report as potentially being the repository for vermiculite processing waste were inspected by Grace-Conn.

41.   Defendant Jay H. Burrill certified the PA/SI Report as follows:

> I certify under penalty of law that the information
> provided in this document is true, accurate, and
> complete. I am aware that there are significant civil
> penalties for knowingly submitting false, inaccurate, or
> incomplete information, and that I am committing a crime

- 13 -

013a

of the fourth degree if I make a written false statement which I do not believe to be true. I am also aware that if I knowingly direct or authorize the violation of any statute, I am personally liable for the penalties.

42. Defendant Robert J. Bettacchi certified the PA/SI Report as follows:

I certify under penalty of law that I have personally examined and am familiar with the information submitted herein and all attached documents, and that, based on my inquiry of those individuals immediately responsible for obtaining the information, I believe that the submitted information is true, accurate and complete. I am aware that there are significant civil penalties for knowingly submitting false, inaccurate, or incomplete information, and that I am committing a crime of the fourth degree if I make a written false statement which I do not believe to be true. I am also aware that if I knowingly direct or authorize the violation of any statute, I am personally liable for the penalties.

43. In the Negative Declaration submitted with the PA/SI Report, Defendant Jay H. Burrill stated that he had "specific knowledge of the operations" of Grace-Conn's Hamilton Plant, and that "any discharge(s) of hazardous substances or hazardous wastes on or from the industrial establishment have been remediated in accordance with N.J.A.C. 7:26B (Technical Requirements for Site Remediation) and approved by the Department."

44. Defendant Jay H. Burrill certified the Negative Declaration as follows:

I certify under penalty of law that the information provided in this document is true, accurate, and complete. I am aware that there are significant civil penalties for knowingly submitting false, inaccurate, or incomplete information, and that I am committing a crime of the fourth degree if I make a written false statement which I do not believe to be true. I am also aware that

014a

if I knowingly direct or authorize the violation of any statute, I am personally liable for the penalties.

45. Defendant Robert J. Bettacchi certified the Negative Declaration as follows:

> I certify under penalty of law that I have personally examined and am familiar with the information submitted herein and all attached documents, and that, based on my inquiry of those individuals immediately responsible for obtaining the information, I believe that the submitted information is true, accurate and complete. I am aware that there are significant civil penalties for knowingly submitting false, inaccurate, or incomplete information, and that I am committing a crime of the fourth degree if I make a written false statement which I do not believe to be true. I am also aware that if I knowingly direct or authorize the violation of any statute, I am personally liable for the penalties.

46. As a result of the representations made by Defendants, the DEP issued No Further Action Letters for the Site dated August 21, 1995 and November 15, 1995.

47. On or about May 3, 2005, the DEP rescinded the No Further Action letters.

### FIRST COUNT

#### ISRA

48. Plaintiff repeats each allegation of paragraph nos. 1 through 47 above as though fully set forth in its entirety herein.

49. Asbestos is a "hazardous substance" within the meaning of N.J.S.A. 13:1K-8.

50. The Hamilton Plant operated by Grace-Conn at the Site was an "industrial establishment" within the meaning of N.J.S.A. 13:1K-8 when Grace-Conn ceased operations in 1994.

- 15 -

51.    Pursuant to N.J.S.A. 13:1K-13b, Plaintiff is authorized to bring an action in Superior Court for a civil penalty against any person who knowingly gives or causes to be given any false information or who fails to comply with ISRA, and against any officer or management official of an "industrial establishment" who knowingly directs or authorizes the violation of ISRA. Any such person, officer, or management official shall be personally liable for a penalty of not more that $25,000 for each offense, with each day the violation continues constituting an additional and separate offense.

52.    Defendant Grace-Conn. shipped several hundred thousand tons of vermiculite concentrate from the Libby mine to the Hamilton Plant from 1957 to 1991. The vermiculite concentrate received at the Hamilton Plant was milled from vermiculite ore at the Libby mine facilities.

53.    During the relevant periods referenced in this Complaint, Defendants knew that the vermiculite ore mined from the Libby mine contained tremolite asbestos and that the milling process conducted at the mine caused the release of tremolite asbestos at the mine and the surrounding community.

54.    During the relevant times referenced in this Complaint, Defendants knew that the asbestos fibers released at the Libby mine contaminated the soil at the mine and the surrounding community and

- 16 -

that it caused a variety of asbestos-related diseases to mine employees and the residents of the surrounding community.

55. During the relevant times referenced in this Complaint, Defendants knew that dust containing tremolite asbestos was released from vermiculite concentrate during the expansion or exfoliation process conducted at vermiculite processing plants throughout the United States, including Hamilton Plant.

56. Defendant Grace-Conn. shipped several hundred thousand tons of vermiculite concentrate from the Libby mine to the O.M. Scott plant in Marysville, Ohio ("Scott Plant") between approximately 1948 and 1980.

57. During the relevant times referenced in this Complaint, Defendants knew that tremolite asbestos-containing dust released at the Scott Plant and fibers released from the tremolite asbestos-contaminated vermiculite concentrate processed at the Scott Plant caused "bloody pleural effusions," i.e, the build up of bloody fluids between the pleural lining and the lung, in employees of the O.M. Scott plant.

58. During the relevant times referenced in this Complaint, Defendants knew that tremolite asbestos fibers were released from the handling of vermiculite-based commercial and consumer products, and that tremolite asbestos fibers had contaminated the Hamilton Plant and the soil at the Site.

- 17 -

59.  On or about June 5, 1995, Defendant Grace-Conn knowingly provided or caused to be provided false or misleading information in the PA/SI Report and submitted to the DEP in that the PA/SI report failed to note that the dust released at the Site during the expansion of the vermiculite concentrate and emissions from other manufacturing, handling, and processing operations conducted at the Site were known to contain concentrations of asbestos fibers and that asbestos was discharged to the soil at the Site; and in that, the PA/SI report failed to make reference to the reports referred to in paragraphs 19-23 above, thereby misleading DEP's ISRA staff.

60.  On or about June 5, 1995, Defendant Grace-Conn knowingly provided or caused to be provided false or misleading information in the Negative Declaration submitted to the DEP in that the Negative Declaration represented that any discharge of a hazardous substance or hazardous waste at the Site had been remediated in accordance with the plaintiff's Technical Requirements for Site Remediation, N.J.A.C. 7:26E when the discharges of asbestos fibers at the Site had not been so remediated.

61.  On or about June 5, 1995, at which time Defendant Burrill was a management official of Defendant Grace-Conn, Defendant Burrill knowingly provided or caused to be provided false or misleading information in the PA/SI Report in that the PA/SI report failed to note that the dust released at the Site during the expansion of the vermiculite concentrate and emissions from other

- 18 -

manufacturing, handling, and processing operations conducted at the Site were known to contain concentrations of asbestos fibers and that asbestos was discharged to the soil; and in that, the PA/SI report failed to make reference to the reports referred to in paragraphs 19-23 above, thereby misleading DEP's ISRA staff. As such, Defendant Burrill also knowingly directed or authorized a violation of ISRA.

62.   On or about June 5, 1995, at which time Defendant Burrill was a management official of Defendant Grace-Conn, Defendant Burrill knowingly provided or caused to be provided false or misleading information in the Negative Declaration submitted to the DEP in that the Negative Declaration represented that any discharge of a hazardous substance or hazardous waste at the Site had been remediated in accordance with the plaintiff's Technical Requirements for Site Remediation, N.J.A.C. 7:26E when the discharge of asbestos fibers at the Site had not been so remediated. As such, Defendant Burrill also knowingly directed or authorized a violation of ISRA.

63.   On or about June 5, 1995, at which time Defendant Bettacchi was a management official of Defendant Grace-Conn, Defendant Bettacchi knowingly provided or caused to be provided false or misleading information in the PA/SI Report in that in that the PA/SI report failed to note that the dust released at the Site during the expansion of the vermiculite concentrate and emissions

- 19 -

from other manufacturing, handling, and processing operations conducted at the Site were known to contain concentrations of asbestos fibers and that asbestos was discharged to the soil; and in that, the PA/SI report failed to make reference to the reports referred to in paragraphs 19-23 above, thereby misleading DEP's ISRA staff. As such, Defendant Bettacchi also knowingly directed or authorized a violation of ISRA.

64. On or about June 5, 1995, at which time Defendant Bettacchi was a management official of Defendant Grace-Conn, Defendant Bettacchi knowingly provided or caused to be provided false or misleading information in the Negative Declaration submitted to the DEP in that the Negative Declaration represented that any discharge of a hazardous substance or hazardous waste at the Site had been remediated in accordance with the plaintiff's Technical Requirements for Site Remediation, N.J.A.C. 7:26E when the discharge of asbestos fibers at the Site had not been so remediated. As such, Defendant Bettacchi also knowingly directed or authorized a violation of ISRA.

65. Since June 5, 1995, each of the Defendants has continued to withhold the correct information that should have been included in the PA/SI and the Negative Declaration and has failed to correct the misinformation provided in the PA/SI and the Negative Declaration.

- 20 -

020a

PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that this Court:

a. Find each of the Defendants in violation of ISRA;

b. Assess a civil penalty of $25,000 against each of the Defendants for the submission of the false information in the PA/SI Report and Negative Declaration and for each day Defendants failed to correct the false information set forth in the PA/SI report and the Negative Declaration;

c. Assess a civil penalty of $25,000 against Defendant Burrill for knowingly authorizing a violation of ISRA and for each day that he failed to cease the violation.

d. Assess a civil penalty of $25,000 against Defendant Bettacchi for knowingly authorizing a violation of ISRA and for each day that he failed to cease the violation.

e. Award the Plaintiff its costs and fees in this action; and

f. Award the Plaintiff such other relief as this Court deems appropriate.

Second Count

Spill Act

66. Plaintiff repeats each allegation of paragraph nos. 1 through 65 above as though fully set forth in its entirety herein.

67. Each Defendant is a "person" within the meaning of N.J.S.A. 58:10-23.11b.

- 21 -

021a

68. Asbestos is a "hazardous substance" within the meaning of N.J.S.A. 58:10-23.11b.

69. Pursuant to N.J.S.A. 58:10-23.11u.a(1)(c), Plaintiff is authorized to bring an action in the Superior Court for a civil penalty against any person who knowingly has given false testimony, documents, or information to the Plaintiff. Any such person shall be subject to a civil penalty not to exceed $50,000, and each day of shall constitute an additional, separate, and distinct violation.

70. Each of the Defendants knowingly provided or caused to be provided false or misleading information in the PA/SI Report and Negative Declaration submitted to the NJDEP.

71. Since June 5, 1995, each of the Defendants has knowingly failed to correct the false or misleading information in the PA/SI Report and Negative Declaration submitted to the NJDEP.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

a. Find the Defendants in violation of the Spill Act;

b. Assess against each of the Defendants a civil penalty of $50,000 for the submission of the false information in the PA/SI Report and the Negative Declaration and for each day Defendants failed to correct the false information set forth in the PA/SI report and the Negative Declaration;

- 22 -

022a

c. Award the Plaintiff its costs and fees in this action;
and

d. Award the Plaintiff such other relief as this Court
deems appropriate.

PETER C. HARVEY
ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiff

By: _____
John F. Dickinson, Jr.
Deputy Attorney General

Dated: June 1, 2005

## DESIGNATION OF TRIAL COUNSEL

Pursuant to R. 4:25-4, the Court is advised that John F. Dickinson, Jr., Deputy Attorney General, is hereby designated as trial counsel for the Plaintiff in this action.

- 23 -

023a

<u>CERTIFICATION REGARDING OTHER PROCEEDINGS AND PARTIES</u>

Undersigned counsel hereby certifies, in accordance with R. 4:5-1(b)(2), that the matter in controversy in this action is not the subject of any other pending or contemplated action in any court or arbitration proceeding known to the Plaintiff at this time, nor is any non-party known to the Plaintiff at this time who should be joined in this action pursuant to R. 4:28, or who is subject to joinder pursuant to R. 4:29-1. If, however, any such non-party later becomes known to the Plaintiff, an amended certification shall be filed and served on all other parties and with this Court in accordance with R. 4:5-1(b)(2).

PETER C. HARVEY
ATTORNEY GENERAL OF NEW JERSEY
Attorney for Plaintiff

By: _____
John F. Dickinson, Jr.
Deputy Attorney General

Dated: June 1, 2005

Grace complaint.wpd

- 24 -

024a

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| W. R. GRACE & CO., et al. | ) | Case No. 01-01139 (JKF) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
| W. R. GRACE & CO., et al. | ) | Adversary Proceeding No. ___ |
|  | ) |  |
| Plaintiffs, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| BRADLEY M. CAMPBELL, | ) |  |
| COMMISSIONER OF THE NEW | ) |  |
| JERSEY DEPARTMENT OF | ) |  |
| ENVIRONMENTAL PROTECTION, in | ) |  |
| his official capacity, PETER C. HARVEY, | ) |  |
| ATTORNEY GENERAL OF NEW | ) |  |
| JERSEY, in his official capacity, | ) |  |
|  | ) |  |
| Defendants. | ) |  |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

W.R. Grace & Co. and W. R. Grace & Co-Conn. (collectively "Grace"), as

Debtors and debtors-in-possession in the above-captioned Chapter 11 Cases, and plaintiffs in the

above-captioned adversary proceeding, allege for their Complaint, upon knowledge of their own

acts and upon information and belief as to all other matters, as follows:

## SUMMARY OF ACTION

1.     This is an adversary proceeding brought pursuant to Fed. R. Bankr. P.

7001(7) and (9) and Fed. R. Bankr. P. 7065, for declaratory and injunctive relief to enjoin the

Defendants from prosecuting an action in New Jersey Superior Court against Grace, Grace officer Robert J. Bettacchi, and former Grace employee Jay H. Burrill, based on defendants' submission of an allegedly false report to the New Jersey Department of Environmental Protection ("DEP") more than ten years ago.

2.      On June 1, 2005, more than four years after Grace filed for Chapter 11 bankruptcy protection, the DEP brought a civil action in New Jersey state court against Grace and two Grace employees seeking to recover more than $800 million. The complaint does not seek to force the remediation of environmental injury, recover for the costs of environmental clean-up, or even impose penalties for environmental violations. Rather, DEP claims that in a June 1995 report, defendants should have provided additional information about the expansion of vermiculite concentrate, and because defendants failed to do so, the State of New Jersey may recover $75,000 in civil penalties for every day over the last ten years that defendants failed to correct this allegedly false report.

3.      The New Jersey action clearly threatens the orderly administration of the Grace estate. So long as the New Jersey action continues outside this Court, no plan of reorganization for Grace could be completed. It simply makes no sense to waste assets of the bankruptcy estate by requiring the debtors to participate in protracted and expensive litigation outside the confines of this Court. Therefore, Grace intends to remove the New Jersey action to the United States District Court for the District of New Jersey and move to have the case transferred to this District where the claims may be referred to this Court for adjudication within the context of the bankruptcy proceeding.

2

4.      Grace now files this adversary complaint for declaratory and injunctive relief seeking to enjoin defendants from prosecuting the New Jersey action against Grace and its employees until it may be transferred to this Court. In the event that the removal and transfer proves unsuccessful, Grace seeks an injunction staying the New Jersey action stayed until the conclusion of the bankruptcy process.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157 and 1334. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B) and (O).

6.      Venue of this action in this District is proper under 28 U.S.C. § 1409.

7.      The statutory predicates for relief requested herein are Sections 362(a) and 105(a) of the Bankruptcy Code, Fed. R. Bankr. P. 7065, and the All Writs Act, 28 U.S.C. § 1651.

## THE PARTIES

8.      The plaintiffs in this adversary proceeding are W. R. Grace & Co. and W. R. Grace & Co-Conn., debtors in the underlying bankruptcy case, Case No. 01-01139 et al. (JKF).

9.      The defendants in this proceeding are two New Jersey state officials who direct the litigation filed against Grace by the DEP in New Jersey state court. Defendant Bradley M. Campbell is Commissioner of the DEP. Peter C. Harvey is Attorney General for the State of New Jersey. They are sued here in their official capacity.

3

91100-001\DOCS_DE:111664.1

027a

## FACTUAL BACKGROUND

10.    On April 2, 2001, Grace and related entities filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The State of New Jersey received notice of the bankruptcy petition with other creditors, and New Jersey instrumentalities thereafter filed proofs of claim.

11.    More than four years later, on June 1, 2005, the New Jersey DEP, a governmental unit of the State of New Jersey, brought an action against Grace seeking to recover more than $800 million. Although the State was aware of the Grace bankruptcy, DEP chose to file its action in the Superior Court of New Jersey, Mercer County. The New Jersey State action charges Grace with violating two state statutes, the Industrial Site Recovery Act, N.J.S.A. 13:1k-8 et seq. ("ISRA") and the New Jersey Spill and Compensation Act, N.J.S.A. 58:10-23.11b et seq ("the Spill Act").

12.    The complaint alleges that Grace, which operated an industrial plant in Hamilton Township, New Jersey, together with then-employees, Robert J. Bettacchi and Jay H. Burrill, failed in a June 5, 1995 report to DEP to disclose material facts to State environmental authorities concerning the risks of processing asbestos-contaminated vermiculite. Complaint ¶¶ 60-64 (attached as Exhibit 1). The complaint further alleges that "since June 5, 1995, each of the Defendants has continued to withhold the correct information that should have been include in the [report] and has failed to correct the misinformation provided in the [report]." *Id.* ¶ 65.

13.    The allegations against Mr. Bettacchi and Mr. Burrill track verbatim those raised against the Debtors themselves, *see id.* ¶¶ 59-64, because, as plaintiffs have alleged, Bettachi and Burrill were acting on behalf of Grace in their respective capacities as Vice

4

President and Environmental Coordinator, when they made the representations that New Jersey now alleges were "false and misleading," *id.* ¶¶ 61-64, 71.

14.    Debtors' by-laws require that Grace indemnify, to the fullest extent allowed under applicable law, each person who was or is made a party or is threatened to be made a party to or is "involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative," by reason of the fact that he or she was serving as a director, officer, employee of Grace or Grace-Conn. Amended and Restated By-Laws of W. R. Grace & Co. Article II, §6.7 (emphasis added) (Exhibit 2). Accordingly, the financial burdens of the entire litigation fall squarely on the Debtors and, by extension, all creditors of the estate.

15.    As a result of filing the allegedly false report, the complaint seeks to assess liability against each defendant for $25,000 under ISRA and for $50,000 under the Spill Act. Compl. 21, 22-23. In addition, the complaint alleges the defendants have committed a separate violation of the ISRA and the Spill Act for "each day Defendants failed to correct the false information" set forth in the report. *Id.* DEP thus claims that defendants' refusal to concede the falsity of the June 1995 report equates to a total liability of $75,000 for every day from June 5, 1995 until the present day, for a total amount of civil penalties that exceeds $800 million and presumably grows each day.

16.    By a notice filed in New Jersey Superior Court on September 19, 2005, the defendants have removed the New Jersey action to the United States District Court of New Jersey and intend to move that court to transfer the action to the District Court of Delaware so that this Court may assume jurisdiction over the action and decide the case in the course of the bankruptcy. Because permitting the case to go forward against Bettacchi and Burrill without the

5

Debtors would be tantamount to allowing the case to proceed against the Debtors, the Debtors seek to bring the claims against the individuals before this Court as well.

**Relief Requested**

17.    The separate prosecution of the New Jersey action will inevitably threaten the orderly administration of the Grace estate.  Through the filing of this adversary complaint, defendants seek an order enjoining the responsible New Jersey officials—the DEP Commissioner and the Attorney General—from prosecuting the New Jersey action until such time that this Court assumes jurisdiction over the removed and transferred action, or if the action is not brought before this Court, until Grace emerges from bankruptcy.  Because the New Jersey action does not constitute a "police power" action under the Bankruptcy Code, the action should be stayed pursuant to the automatic stay of section 362.  In the alternative, even if the action is not subject to the automatic stay, the action "run[s] so contrary to the policy of the Bankruptcy Code that it should not be permitted," *In re Penn Terra*, 733 F.2d 267, 273 (3d Cir. 1984), but rather should be stayed pursuant to this Court's general equitable powers under section 105 of the Code.

**PLAINTIFFS' FIRST CLAIM FOR RELIEF**

(Automatic Stay Declaratory Judgment)

18.    The Debtors repeat and reallege the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

19.    Debtors seek a declaratory judgment that the continued prosecution of the New Jersey action would violate the automatic stay.  Section 362(a) of the Bankruptcy Code

6

prohibits the commencement or continuation of any judicial proceeding against the debtor to recover on claims that arose before the bankruptcy. The Code provides a limited exception from the automatic stay for regulatory actions that are necessary for the State to vindicate its "interest in the general safety and welfare." *United States v. Nicolet, Inc.*, 857 F.2d 202, 208 (3d Cir. 1988). But the New Jersey action is not such an action. Because the $800 million that New Jersey seeks to recover from the defendants is not proportional to any safety or welfare interest that the State may have in the action, the action should be recognized for what it is: a sizable financial claim on the bankruptcy estate, which should be dealt with on the same terms that the Bankruptcy Code provides for all other creditors.

20.    The New Jersey action should be declared to be subject to the automatic stay. As the Third Circuit has recognized, "In addition to providing the debtor with a 'breathing spell,' the [automatic] stay is intended to replace an unfair race to the courthouse with an orderly liquidation procedure designed to treat all creditors equally." *Id.* at 207. Congress recognized the same in enacting the automatic stay. *See* H. Rep. No. 95-989, at 340 2d Sess. (1978) (emphasis added) ("The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops *all* collection efforts, *all* harassment, and *all* foreclosure actions.")

21.    The New Jersey action is based on the submission of the report six years prior to the bankruptcy, and the action clearly arose prior to the filing of the bankruptcy petition. The action therefore should be subject to the automatic stay.

22.    The New Jersey action does not fall within the exception that the Code provides for certain government regulatory actions. The Bankruptcy Code exempts from the

7

automatic stay governmental actions seeking to protect the public safety and welfare, provided that those actions do not directly target the property under the jurisdiction of the bankruptcy court. *See* 11 U.S.C. § 362(b)(4) (emphasis added) (The automatic stay shall not apply to actions "by a governmental unit to enforce such government unit's police or regulatory power, including the enforcement of a judgment *other than a money judgment*.").

  23. The Courts of Appeals have recognized that not every state regulatory action merits an exception to the automatic stay. Rather, courts measure the action against the purpose of the exception, and "ask whether the governmental proceeding relates principally to the protection of the government's interest in the debtor's property, rather than to its public policy interest in the general safety and welfare. In the former situation, the action is not exempt from the stay." *Nicolet*, 857 F.2d at 209; *see also Chao*, 270 F.3d at 385-86 ("[C]ourts [must] focus on whether the governmental proceeding relates primarily to the protection of the government's pecuniary interest in the debtor's property, and not to matters of public safety."); *In re Cash Currency Exchange*, 762 F.2d 542, 555 (7th Cir. 1985) ("This exception has been narrowly construed to apply to the enforcement of state laws affecting health, welfare, morals and safety, but not to regulatory laws that directly conflict with the control of the *res* or property by the bankruptcy court."); *Missouri v. United States Bankruptcy Court*, 647 F.2d 768, 776 (8th Cir. 1981) ("Missouri's grain laws, although regulatory in nature, primarily relate to the protection of the pecuniary interest in the debtors' property and not to matters of public safety and health.").

  24. New Jersey's attempt to recover more than $800 million from Grace "principally" reflects the State's financial "interest in the debtors' property," rather than its

8

"interest in the general safety and welfare." In the environmental context, the Third Circuit has recognized that a State may bring a police power action to require the debtor to clean up an environmental hazard, *see Penn Terra Ltd. v. Dep't of Envtl. Resources*, 733 F.2d 267, 272 (3d Cir. 1984), or to "fix damages" for the costs of the government's efforts to clean up an environmental violation. *Nicolet*, 857 F.2d at 208. But the Third Circuit has never held that where the government action is not proportional to any direct or ongoing public harm, and indeed, where the size of the liability would severely disrupt the administration of the estate, the State action may proceed outside the bankruptcy.

25.    The magnitude of the fines in the New Jersey action—and its lack of proportion to any real harm to the public health and welfare—demonstrates that the action's underlying purpose is to put money in the State's coffers, not to enforce any conceivable regulatory interest. The New Jersey action does not seek to protect the "general safety and welfare" by requiring the debtors to clean up the environment or repay the government for damages caused. (Indeed, the remediation of the site is occurring under the auspices of the federal government, not the State.) The New Jersey action does not even seek to deter future harm by imposing civil penalties for environmental harm. Rather, the DEP claims an entitlement to more than $800 million of the debtors' property based solely on Grace's failure to "correct" an allegedly false report filed ten years ago. DEP has not identified, and cannot identify, any regulatory interest that would require its case to proceed in state court rather than in federal bankruptcy court. Because the extravagant size of the claimed liability bears no proportional relationship to the State's interest in the "general safety or welfare," the DEP's interest extends

9

"principally" to the State's "interest in the debtors' property" and should therefore be declared subject to the automatic stay.

## PLAINTIFFS' SECOND CLAIM FOR RELIEF
(Section 105 Injunction)

26.    The Debtors repeat and reallege the allegations contained in the preceding paragraphs of the Complaint as if fully set forth herein.

27.    Alternatively, even if the Court found that the New Jersey action is not subject to the automatic stay, Debtors seek a preliminary and permanent injunction staying the prosecution of the New Jersey action under the general equitable powers provided by section 105.

28.    Congress specifically recognized, in crafting the exception to the automatic stay, that "in some individual situations, the exercise of State power, *even for the protection of the public health and safety,* may run so contrary to the policy of the Bankruptcy Code that it should not be permitted." *In re Penn Terra*, 733 F.2d 267, 273 (3d Cir. 1984) (emphasis added). "The statute provides for such exigencies," because "[t]he bankruptcy court, in its discretion, may issue an appropriate injunction, *even if the automatic stay is not operative.*" *Id. See also In re Baldwin-United Corp. Litig.*, 765 F.2d 343, 348 (2d Cir. 1985) ("Even if it should be determined that the automatic stay does not apply ... the Bankruptcy Court has authority under § 105 broader than the automatic stay provision of § 362 and may use its equitable powers to assure the orderly conduct of the reorganization proceedings.").

29.    Section 105(a) empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."

10

11 U.S.C. § 105(a). In providing that the filing of a bankruptcy petition does not *automatically* stay some state regulatory actions, Congress specifically recognized that bankruptcy courts retained the authority under Section 105 to stay such actions on a case-by-case basis, where a stay is necessary to prevent "an impermissible dilution of federal bankruptcy policy." *Penn Terra*, 733 F.2d at 273.

30.    Congress provided that a bankruptcy court may grant a Section 105 injunction against a state regulatory action "under the usual rules for the issuance of injunctions." *Id.* (quoting S. Rep. No. 95-989, at 51; H. Rep. No. 95-595 at 342). In this Circuit, bankruptcy courts consider (1) the likelihood of success, (2) the plaintiff's risk of irreparable harm, (3) any irreparable harm to be suffered by the defendant, and (4) the public interest. *See American Tel. & Tel. Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994); *In re Zenith Labs.*, 104 B.R. 659, 665 (D.N.J. 1989). Debtors can demonstrate an entitlement to equitable relief under all four factors here.

31.    <u>Likelihood of Success.</u> In this context, the likelihood of success does not concern the merits of the New Jersey action, but rather "the likelihood of success on the merits logically must refer to whether the debtor can show that enforcement of the state laws will *unduly interfere* with the bankruptcy adjudication." *In re Security Gas & Oil, Inc.*, 70 B.R. 786, 793 n.3 (Bankr. N.D. Cal. 1987) (emphasis added); *see also In re Hunt*, 93 B.R. 484, 493 (N.D. Tex. 1988) (same); *In re Pub. Serv. Co. of N.H.*, 98 B.R. 120, 125 (Bankr. D.N.H. 1989).

32.    Courts have recognized that government regulatory proceedings unduly interfere with the bankruptcy "when those proceedings would threaten the debtor's estate, and when the court has jurisdiction over a petition in bankruptcy ...." *NLRB v. Superior*

11

*Forwarding, Inc.*, 762 F.2d 695, 698 (8th Cir. 1985); *SEC v. First Financial Grp.*, 645 F.2d 429, 440 (5th Cir. 1981) ("To the extent that the exercise of this jurisdiction threatens the assets of the debtor's estate, the bankruptcy court may issue a stay of those proceedings.")

33.     The New Jersey action clearly "unduly interfere[s]" with the bankruptcy and "threaten[] the assets of the estate." The potential size of the New Jersey action is enormous: over $800 million. The debtors and the creditors simply could not agree on a reorganization plan that did not account for the threat of massive additional liability hovering outside the bankruptcy case. Moreover, the New Jersey action will interfere with the bankruptcy process by distracting the attention of Grace and the other officers who would have to divide their attention between the state civil litigation and the bankruptcy actions. *See Hunt*, 93 B.R. at 496; *see also NLRB*, 762 F.2d at 699.

34.     **Plaintiff's Risk of Irreparable Harm**. Debtors would suffer irreparable harm if they were forced to litigate the New Jersey action outside the confines of the bankruptcy process. Courts have recognized that debtors readily suffer irreparable harm when they are forced to participate in a substantial litigation at the same time as the bankruptcy proceeding. *E.g., Hunt*, 93 B.R. at 493.

35.     Forcing Grace to litigate the New Jersey action outside this Court would involve "the incurring of needless litigation expenses" in a state court proceeding lacking the efficiencies of the Bankruptcy Court. *Id.; see NLRB*, 762 F.2d at 699 ("the costs incurred in defending" against outside litigation should not be allowed to "deplete the estate"); *Hunt*, 93 B.R. at 496 ("Litigation costs must nevertheless be considered as an element of harm to the

12

debtors' estates in addition to the harm from the diversion of the Debtors' and counsel's attention from the Chapter 11 cases.").

36.    Moreover, the vermiculite claims in the New Jersey action are related to both personal injury and property damage claims that will be adjudicated by this Court. It simply makes no sense to waste the estate's resources in duplicative litigation, particularly where it would create a risk of inconsistent adjudications.

37.    In addition to the irreparable loss from litigation costs, debtors can show irreparable harm because of "the harm to the creditors and estate from disrupting the court's ability to effectively manage the Debtors' reorganization efforts." *Id.* at 496. The estate clearly would suffer irreparable harm if it must participate in a substantial civil litigation outside of the bankruptcy process, because of the "additional demands in preparing pleadings, participating in discovery and attending hearings," which "would clearly disrupt the Debtors' efforts to effectuate plans of reorganization during the exclusivity period of 11 U.S.C. § 1121(b), which would benefit all of the creditors." *Id.* Furthermore, "a simultaneous proceeding would also disrupt the Court's timetables for resolving claims and waste preciously scarce judicial resources." *Id.*

38.    **Defendants' Risk of Irreparable Harm.** DEP cannot demonstrate any harm either from delaying its action or from having the action resolved, like claims of other creditors, in the bankruptcy court. Defendants have already waited almost ten years to bring the action. Moreover, if this Court assumes jurisdiction over the removed New Jersey action, then defendants indeed will suffer little prejudice because they will be able to have their claim heard promptly within the bankruptcy forum.

13

037a

39.    **The Public Interest.**  An injunction will serve the broader public interest because it will prevent the state action from interfering with the strong federal policies underlying the bankruptcy process.  As the Court held in *Hunt*, "Chapter 11 expresses the public interest of preserving the going concern values of businesses, protecting jobs, ensuring the equal treatment of and payment of creditors, and if possible saving something for the equity holders." *Hunt*, 93 B.R. at 497.  Federal law vests the Bankruptcy Court with the authority to make sure that the claims of all creditors are respected, and an injunction with further these policies by ensuring that the state action does not interfere with the bankruptcy process.

40.    Because New Jersey's "exercise of State power" in bringing an $800 million lawsuit in state court "run[s] so contrary to the policy of the Bankruptcy Code that it should not be permitted," *Penn Terra*, 733 F.2d at 273, an injunction pursuant to Section 105 should issue.

## PLAINTIFFS' THIRD CLAIM FOR RELIEF
(Section 105 Injunction)

41.    The Debtors repeat and reallege the allegations contained in the preceding paragraphs of the Complaint as if fully set forth herein.

42.    The New Jersey actions should also be stayed against the individual defendants because the claims against them cannot be separated from claims against the State. The DEP has filed suit based upon these individuals' conduct as employees of Grace, and Grace's Charter requires the company to indemnify those individuals for any judgments against them to the fullest extent of the law.  No matter whether this Court stays the claims against Grace pursuant to Section 362(a) or Section 105, the Court likewise has the authority to protect the

14

estate by staying claims against related parties where, as here, those claims are indistinguishable from claims against the estate.

43.    New Jersey's lawsuit against Grace officers Bettacchi and Burrill to recover civil penalties for alleged submissions of false statements is a transparent attempt to circumvent the protections of the automatic stay. Grace will be irreparably harmed if the New Jersey action against the officers is allowed to continue. Accordingly, the protections of section 362(a) of the Bankruptcy Code extend to the New Jersey action against Bettacchi and Burrill. *E.g.*, *In re American Film Technologies, Inc.*, 175 B.R. 847, 855 (Bankr. D. Del. 1994); *McCartney v. Integra Nat'l Bank North*, 106 F.3d 506 (3d Cir. 1997).

44.    The Third Circuit has held that an action against non-debtors should be stayed when the debtor can demonstrate "unusual circumstances" as set out by the Fourth Circuit's decision in *A.H. Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir. 1986). *See Belcufine v. Aloe*, 112 F.3d 633, 637 (3d Cir. 1997). The *Robins* court defined "unusual circumstances" as "when there is such identity between the debtor and the third party defendant that the debtor may be said to be the real party defendant and that a judgment against the third party defendant will in effect be a judgment or finding against the debtor." 788 F.2d at 999. According to the court, "[a]n illustration of such a situation would be a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case." *Id.*

45.    As in *In re Lomas Fin. Corp.*, 117 B.R. 64, 68 (S.D.N.Y. 1990), the action against Grace's employees should be enjoined. There, Northern Trust filed a complaint against two officers of debtor Lomas, alleging that the officers made negligent or fraudulent .

15

91100-001\DOCS_DE:111664.1

misrepresentations regarding Lomas's financial condition. *Id.* at 65. Based on these alleged misrepresentations, Northern Trust advanced $20 million to Lomas, which was subsequently unable to repay the loan. *Id.* The court held that the action against the officers should be enjoined because the debtor's corporate charter contained "an indemnification clause, obligating Lomas to indemnify its officers for all legal claims arising out of acts performed in their capacity as Lomas officers," and because it was "undisputed that [the officers'] alleged fraudulent misrepresentations were in fact made in their capacity as Lomas officers," the facts of the case satisfied the "unusual circumstances" standard set forth in *Robins.* 117 B.R. at 68. On that basis, the court held that "the Bankruptcy Court appropriately stayed the action against a non-debtor third party pursuant to § 362(a)(1) of the Code." *Id.*

46.    Similarly, in the present case, Grace's Bylaws provide for indemnification of claims against its officers and directors. New Jersey does not claim that either Mr. Bettacchi or Mr. Burrill undertook any of the alleged acts of misrepresentation in any other capacity than as an officer of Grace. Should a judgment for damages ever be entered against either officer, he would have a claim for indemnification against the Debtors to the fullest extent of the law. Accordingly, there is a substantial identity of interest between Grace and its employees, and the stay against Grace should be extended to the action against its co-defendants.

47.    In addition, it is plain that Grace is the real party defendant. For example, the New Jersey action seeks to recover from Mr. Bettacchi and Mr. Burrill the exact same civil penalties it seeks from Grace under precisely the same legal theories asserted against the Debtors. Indeed, the complaint draws no distinction among the conduct or the liability of the defendants. Similarly, because any judgment against Grace's employees might be imputed

16

against the Debtors in subsequent litigation, Grace has a direct interest in the outcome of New Jersey's action against its individual officers. These facts together support a finding of "unusual circumstances" such that the New Jersey action against Bettacchi and Burrill is in fact an action against the Debtors.

       48.    Because the DEP's complaint demonstrates beyond a doubt that the actions against Grace's employees are inextricably linked to those of Grace, continued litigation of the New Jersey action will cause irreparable harm to Grace. The New Jersey action against Mr. Bettacchi and Burrill should likewise be enjoined under Section 105.

       **WHEREFORE,** the Debtors respectfully request relief as follows:

1) a declaratory judgment that the continued prosecution of the New Jersey action would violate Section 362(a) of the Bankruptcy Code because the New Jersey action is not a "police power" action under Section 362(b)(2) of the Code;

2) an injunction pursuant to Section 105(a) of the Bankruptcy Code and 28 U.S.C. § 1651 enjoining and prohibiting the Defendants from prosecuting the New Jersey action or commencing future actions against Grace until this Court assumes jurisdiction over the New Jersey action or until the completion of the bankruptcy process; and

91100-001\DOCS_DE:111664.1

041a

3) an injunction pursuant to Section 105(a) of the Bankruptcy Code and 28 U.S.C. §

1651 enjoining and prohibiting the Defendants from prosecuting the New Jersey

action or commencing future actions against Mr. Bettachi and Mr. Burrill, on the

same terms as the injunction against Grace. .

Respectfully Submitted:

Dated: September 19, 2005

KIRKLAND & ELLIS LLP
David M. Bernick, P.C.
Janet S. Baer
Steven A. Engel
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

and

PACHULSKI, STANG, ZIEHL, YOUNG,
JONES & WEINTRAUB P.C.

_Jones E. O'Neill_

Laura Davis Jones (Bar No. 2436)
James E. O'Neill. (Bar No. 4042)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, Delaware  19899-8705
(Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400

Counsel for Debtors and Debtors in
Possession

September 19, 2005

18

042a

IN THE UNITED STATES BANKRUPTCY COURT
FOR DISTRICT OF DELAWARE

IN RE:

W.R. Grace & Co., *et al.*                    Bankruptcy No. 01-1139-JKF
    Debtor(s)                                  Chapter 11
                                 Jointly Administered

W. R. Grace & Co., *et al.*
    Plaintiff(s)

v.                                            Adversary No. 05-52724

Bradley M. Campbell,                          **Related to Doc. No. 1, Complaint filed by Debtors**
Commissioner of the New                       **for Declaratory and Injunctive Relief; Doc. No. 3,**
Jersey Department of Environ-                 **Debtors' Motion for Preliminary Injunction; Doc. No. 6**
mental Protection, in his official            **Motion to Dismiss Adversary Proceeding filed on behalf**
capacity; Peter C. Harvey, Attorney           **of New Jersey DEP, Commissioner of New Jersey DEP,**
General of New Jersey, in his                 **and New Jersey Attorney General**
official capacity
    Defendant(s)

MEMORANDUM OPINION[1]

Debtors filed a complaint for declaratory and injunctive relief and a motion for

preliminary injunction on September 19, 2005, against the Commissioner of the New Jersey

Department of Environmental Protection ("NJDEP") and the Attorney General of the State of

New Jersey in their official capacities. The New Jersey defendants (collectively herein

"NJDEP") moved to dismiss the complaint. Debtors filed an objection to the motion to dismiss.

NJDEP has not filed a response to the motion for preliminary injunction but we take its motion

to dismiss as a response and, because the NJDEP has not stated a basis under Rule 12(b)(6) for

---

[1]This Memorandum Opinion constitutes the court's findings of fact and conclusions of
law.

1

043a

its motion to dismiss but asserts that the automatic stay does not apply to the NJDEP action, we

understand the motion to dismiss as asserting that Debtors have failed to state a cause of action.

When ruling on a Rule 12(b)(6) motion the court must accept as true all factual allegations in the

complaint. *Erickson v. Pardus*, _ U.S. _, 127 S.Ct. 2197, 2200 (2007). The facts essential to

resolution of this matter are not disputed and the issue for the court is a question of law; i.e.,

whether NJDEP's action falls under the police/regulatory exception to the automatic stay. 11

U.S.C. §362(b)(4).

Facts

On or about June 1, 2005, over four years after Debtors filed a chapter 11 petition, the

NJDEP brought a civil action in New Jersey state court[2] against Debtors and Robert J. Bettacchi,

Debtors' vice president, and Debtors' former employee Jay H. Burrill, both of whom Debtors are

obligated to defend and indemnify under Debtors' bylaws. *See* Debtors' Motion for an

Injunction, Adv. Doc. No. 3, at Exhibit 2. The New Jersey action seeks to recover over $800

million[3] with respect to an allegedly false report Debtors filed with the State, and Mr. Bettacchi

---

[2] New York Department of Environmental Protection v. W.R. Grace & Co., Inc., W.R. Grace & Co.-Conn., Grace-Conn Successor, Jay H. Burrill, Robert J. Bettacchi (Civ. No. L-001473-05)(Super. Ct., Mercer County, N.J.). The state case was dismissed without prejudice on September 19, 2005, the date Debtors removed the action to the District Court for the District of New Jersey at Civ. Action No. 05-4581 (MLC), and the date this adversary was filed. The District Court stayed the action before it pending the parties' settlement discussions. The settlement discussions continued during the pendency of the adversary proceeding. *See* note 5 and accompanying text, *infra*. The District Court entered an order directing the parties to notify it of the status of the adversary at bench.

[3] The NJDEP filed a status report with this court on October 22, 2007, stating that it has not demanded over $800 million in penalties, rather $800 million (actually, the number was "closer to $900 million," Transcript of April 2, 2007, Doc. No. 15117, at 81, line 20) is the potential maximum daily penalty available under the New Jersey Spill Compensation and

(continued...)

2

and Mr. Burrill signed, in June of 1995. NJDEP asserts that the report should have provided additional information about contamination caused by expansion of vermiculite concentrate at a site Debtors operated in New Jersey.

At the time of the initial hearing on this matter in November of 2005, this court was prepared to find that the NJDEP action was not one to enforce a governmental unit's police or regulatory power and, therefore, was not excepted from the automatic stay under §362(b)(4). This court ordered the parties to meet and confer in an effort to settle, which they did over a period of a year or more. Those efforts were not successful. Now that the matter is back before us and we have again reviewed the pleadings and applicable law, we find that NJDEP's action is in violation of the automatic stay and so we will deny the motion to dismiss and grant Debtors' request for an injunction with respect to themselves and Mr. Bettacchi and Mr. Burrill. Because the District Court has affirmed this court's order denying NJDEP's motion to file a late proof of claim we also will issue a permanent injunction inasmuch as, based on the District Court's ruling, NJDEP does not have a claim cognizable in bankruptcy.

---

[3](...continued)
Control Act, NJSA 58:10-23.11 to 58:10-23.24, and the New Jersey Industrial Site Recovery Act, NJSA 13:1K-6 to 13:1k-13. The actual penalty amount would be determined by a court based upon proof. The amount of the fine is stated to be $75,000 per day since June of 1995. We note that on March 11, 2008, the District Court for the District of Delaware issued a Memorandum and Order affirming this court's order denying NJDEP's Motion to file a late proof of claim. *See* Civil Action No. 07-536, Doc. No. 18; Bankruptcy No. 01-1139 at Doc. Nos. 18284, 18285. Our order denying NJDEP's motion to file a late proof of claim is at Bankruptcy No. 01-1139 at Doc. No. 16467. In the District Court Memorandum the amount of the claim is stated as "approximately $31 million." Nothing in the record before us explains the discrepancy between $800 million and $31 million as the alleged claim amount. However, we note that the District Court found $31 million to be significant in terms of the effect on Debtors' estate.

3

NJDEP's Action Does Not Fall Within the Police/Regulatory Exception to the Automatic Stay

NJDEP asserts that its action must be permitted to proceed as an exception to the automatic stay. NJDEP relies in part on *In re James*, 940 F.2d 46 (3d Cir. 1991), for the proposition that its 2005 suit falls under the §362(b)(4) police and regulatory power exception to application of the automatic stay. *James* is inapplicable to the matter before us. That case was a civil forfeiture action in which a default judgment was entered against the debtor two days postpetition when the state had had no notice of the filing of the bankruptcy. Further, the bankruptcy court in *James* vacated the state court's default judgment and proceeded to examine the merits of the state forfeiture proceedings. The Court of Appeals held that when a judgment has been entered in a civil forfeiture proceeding by a state court the bankruptcy court does not have power to consider the merits of such proceeding. *James* does not fit the facts of the matter before us.

The NJDEP suit at issue was filed postpetition and has not proceeded to judgment. It was filed, with full knowledge of the bankruptcy, four years postpetition and ten years after the allegedly false report was submitted. The underlying merits of NJDEP's asserted cause of action also are not at issue before us. The question we address is simply whether NJDEP's action violated the stay or is a proper exercise of its police and regulatory power, purely a question of bankruptcy law.

NJDEP relies in part on *Penn Terra Ltd. v. Dept. of Environmental Resources*, 733 F.2d 267 (3d Cir. 1984), where the court found that police/regulatory power is a limited exception to the automatic stay designed solely to protect public health and safety and that a state's enforcement of an injunction which required a debtor to correct violations of state environmental

4

046a

protection statutes was not stayed by §362. In the instant matter, the U.S. Environmental Protection Agency ("EPA") has cleaned up the New Jersey site and has filed a claim in this bankruptcy case. We find that the purpose of the NJDEP action is solely to liquidate its monetary claim for penalties, notwithstanding NJDEP's reliance on its police and regulatory powers as the basis for its suit, inasmuch as the site as to which the report was filed has been cleaned up and the claim for cleanup belongs to the EPA. The NJDEP action seeking a fine with respect to an allegedly false report, particularly where the cleanup has been completed by a federal agency, where the action is not to address a risk to public health, safety or welfare, and where a risk no longer exists, does not fall under the §362(b)(4) exception to the automatic stay.[4]

----

[4]Notwithstanding the fact that NJDEP's action is based on the allegedly false 1995 report, NJDEP repeatedly invoked its entitlement to the §362(b)(4) exception on the basis of public health, safety and welfare. See Adv. Doc. 7, Defendants' Brief in Support of Defendants' Motion to Dismiss Debtors' Complaint for Declaratory and Injunctive Relief and in Opposition to Debtors' Motion for an Injunction, at 6. In its brief NJDEP stated that "[i]t is clear from Penn Terra and its progeny that actions to enforce a State's environmental laws constitute an exercise of the State's police and regulatory powers." Id. at 7. NJDEP cited Penn Terra Ltd. v. Dept. of Environmental Resources, 733 F.2d (3d Cir. 1984), for the proposition that a state's police power permits it to establish the amount of a penalty and that NJDEP is just seeking to fix the amount of the penalty, not to collect it. Penn Terra is inapplicable as it involved enforcement of a consent order concerning cleanup of a site which would require the debtor to expend money. In the matter before us, there is no environmental cleanup or hazard issue. Penn Terra stated that "[t]he police power of the several States embodies the main bulwark of protection by which they carry out their responsibilities to the People." 733 F.2d at 273. In this case the responsibility was executed by the EPA when it performed the cleanup.

NJDEP also referred to U.S. v. LTV Steel Co., Inc., 269 B.R. 576 (W.D.Pa. 2001)(penalty action "primarily related to the safety and welfare of its citizens and not to the protection of the government's pecuniary interest in LTV's property"). Adv. Doc. No. 7, Defendants' Brief at 10. However, NJDEP's action does not have a nexus to protection of public health and safety or welfare.

NJDEP cited U.S. v. Nicolet, Inc., 857 F.2d 202 (3d Cir. 1988), which is inapplicable as it also was an action to recover cleanup costs. In re Torwico Electronics, Inc., 8 F.3d 146 (3d Cir. 1993), cert. denied 511 U.S. 1046 (1994), was discussed in the course of the hearings on this matter and was cited in briefs. That case focused on the difference between a "debt" and a
(continued...)

5

Therefore, the NJDEP action is in violation of the stay and is null and void. *Raymark Industries, Inc. v. Lai,* 973 F.2d 1125, 1131 (3d Cir. 1992)("actions taken in violation of the automatic stay are without effect").

Standards for Injunctive Relief

With respect to the injunction, Debtors must show (1) a likelihood that they will succeed on the merits; (2) the extent to which they will suffer irreparable harm if the injunction is not issued; (3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and (4) that the public interest will not be harmed. *See McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC,* 511 F.3d 350, 356-67 (3d Cir. 2007). Here, all factors favor Debtors.

*Success on the Merits*

Debtors will succeed on the merits inasmuch as the New Jersey action violates the stay and because the NJDEP cannot receive a distribution from this estate based upon its failure to timely file a proof of claim, which it is now barred from filing. Moreover, its action is unrelated to public health, safety or welfare so it does not fall within the §362(b)(4) exception to the stay.

---

[4](...continued)
"claim" in the environmental cleanup context. The Court of Appeals for the Third Circuit noted that requiring a debtor to comply with environmental cleanup obligations, even if it would cost the debtor money, was not a claim for bankruptcy purposes inasmuch as the state was not attempting to collect money to enforce its regulatory and police powers. Here, the NJDEP seeks to do nothing but liquidate a monetary fine.

Regardless of NJDEP's intent to do nothing more than liquidate its penalty claim, even that, at this point in the case, would create needless expense. Because NJDEP cannot file a late proof of claim, whatever unsecured claim it would prove against the Debtors would be discharged in this bankruptcy. No claim will be paid by these Debtors to the NJDEP.

6

Therefore, the merits of its claim with respect to the allegedly false 1995 report will not be addressed in any forum.

*Irreparable Harm to Debtors*

In the environmental context at least, "[i]ssuance of an injunction . . . is appropriate where the threatened state activity would unduly interfere with the proper functioning of the Bankruptcy Code. *In re Security Gas & Oil, Inc.*, 70 B.R. 786, 793 (Bankr.N.D.Cal. 1987). In this case, the question of whether Debtors will suffer irreparable harm must be answered in the affirmative. The District Court agreed with our finding that the NJDEP claim, if permitted to go forward, would have a significant impact on the Debtors' estates. *See* Memorandum Affirming the Judgment of the Bankruptcy Court, Doc. No. 18284, at 6-7. We note that the amount of the claim as stated in the District Court opinion ($31 million) is hundreds of millions of dollars less than the potential claim stated in this adversary action ($800 million). The amount of the claim, even at $31 million, weighs in Debtors' favor with respect to consideration of the relative harm to the parties. The District Court recognized the burden to the estate of such a claim. More significant at this stage of the case, however, is that NJDEP will have no claim to be paid in this case in any amount inasmuch as it failed to file a proof of claim by the bar date. Thus, the irreparable harm by virtue of the expense to the estate of defending an action to liquidate a potential $800 million claim only so that the NJDEP can have some comfort in knowing what it could prove but could not collect is self-evident.

*Harm to NJDEP*

The harm to the NJDEP is significantly less, if, indeed, there is any harm at all. NJDEP asserts that it will suffer irreparable harm if not permitted to proceed because facts and witnesses

7

049a

will be lost but it has not identified any such fact or witness nor has it described any harm to the

public interest occasioned by an allegedly false report regarding a site that has been cleaned up

by another entity. Based on the record before us, the only potential impact would be on

NJDEP's pecuniary interest and a prepetition claim for which NJDEP failed to file a proof of

claim. Any claim that NJDEP would have had if it had timely filed a proof of claim would not

be subject to the police/regulatory power exception to the automatic stay inasmuch as it would

not relate to an immediate or future threat to public health, safety, or welfare. Thus, the NJDEP

is in no position different from any other creditor seeking to collect from these Debtors. Its

claim is strictly monetary.

*The Public Interest*

    NJDEP has not established that an injunction will have an adverse impact on the public

interest. The action is not related, and has not been shown to threaten harm, to public health,

safety, or welfare. In fact, there is no risk of harm to the State or to the public interest as the site

has been cleaned up. Any harm to public health, safety or welfare that may have existed when

the 1995 report was filed has been remediated by the EPA which holds a claim in that regard.

Summary With Respect to Debtors

    Debtors have established entitlement to an injunction. The court in *Penn Terra Ltd. v.*

*Dept. of Environmental Resources,* 733 F.2d 267 (3d Cir. 1984), stated that "[w]here important

state law or general equitable principles protect some public interest, they should not be

overridden by federal legislation unless they are inconsistent with explicit congressional intent

such that the supremacy clause mandates their supersession." 733 F.2d at 273. The Court of

Appeals for the Third Circuit addressed the issue in this fashion:

8

050a

> We believe that the inquiry is more properly focused on the nature of the injuries which the challenged remedy is intended to redress – including whether plaintiff seeks compensation for past damages or prevention of future harm – in order to reach the ultimate conclusion as to whether these injuries are traditionally rectified by a money judgment and its enforcement. Here, the Commonwealth Court injunction was, neither in form nor substance, the type of remedy traditionally associated with the conventional money judgment . . . the . . . injunction was meant to prevent future harm to, and to restore, the environment. . . .
>
> Absent some . . . clear indication that these proceedings . . are actually aimed toward the enforcement of a money judgment, . . . . [w]e . . . conclude that the suit brought by DER to compel Penn Terra to remedy environmental hazards was properly brought as an equitable action to prevent future harm, and did not constitute an action to enforce a money judgment. The automatic stay provision of 11 U.S.C. §362 is therefore inapplicable.

*Penn Terra, supra,* 733 F.2d at 278-79. The situation in *Penn Terra* does not exist here. We are faced with facts virtually contradictory to those addressed in *Penn Terra.* Debtors have substantiated the propriety of and necessity for injunctive relief.

We find that the purpose of the NJDEP action is solely to liquidate its monetary claim for penalties, notwithstanding NJDEP's reliance on its police and regulatory powers as the basis for its suit, inasmuch as the site as to which the report was filed has been cleaned up and the claim for cleanup belongs to the EPA. The harm to Debtors if the action is permitted to go forward would be significant; to the NJDEP, negligible in comparison. Further, the effect on this bankruptcy case if the NJDEP is permitted to go forward with its suit would interfere with congressional intent to limit exceptions to the automatic stay.

Under the circumstances before us, we find that the state interest in protecting the public health, safety and welfare has been addressed by the EPA cleanup and NJDEP's action is not a matter related to public health, safety or welfare. There is no harm to public health, safety or

9

welfare if the New Jersey action is enjoined as the EPA cleaned the site. NJDEP's situation does not fit the police and regulatory exception to the stay.[5]

Regarding Mr. Bettachi and Mr. Burrill

At a hearing before this court in April of 2007, counsel for NJDEP stated that the New Jersey action, if permitted to proceed, would proceed only against Debtors and not the individual defendants. *See* Transcript of April 2, 2007, Doc. No. 15117, at 80-81. However, nothing in the record before us indicates that the action has been dismissed, terminated, or stayed with respect to the individuals. Therefore, we will issue an order granting a preliminary injunction with respect to Mr. Bettacchi and Mr. Burrill inasmuch as the time, cost of defense, and potential liability to these estates based upon the indemnity obligation will have the same adverse effect upon the Debtors' estates as would a direct action against Debtors. Even though Mr. Bettachi and Mr. Burrill are not debtors and, therefore, the stay of §362 does not automatically apply to them, the continuation of the action with respect to them would compel Debtors to defend the allegedly false report in the course of providing a defense to the individuals, thereby involving Debtors in the suit notwithstanding the automatic stay. The impact on the estates, in terms of time and cost, would be similar if not identical to that Debtors would face in defending their own alleged liability.

---

[5]NJDEP cited *In re Travacom Communications, Inc.*, 300 B.R. 635 (Bankr.W.D.Pa. 2003), where the court said that "a governmental agency does not run afoul of an automatic stay by reducing such [money] damages, once they are liquidated, to judgment. . . ." *Id.* at 368. *Travacom* does not apply here inasmuch as damages have not been liquidated. In fact, no claim has been filed in this case with respect to NJDEP. We note that in discussing the applicability of the police/regulatory power exception to §362 the court in *Travacom* pointed out that §362(b)(4) applies to stop future harm as well as to fix damages for past conduct, *id.*, but the conduct referred to is that which affects the public interest. The public's interest in this case is not served by the NJDEP's action.

10

Conclusion

The NJDEP has not met its burden with respect to its motion to dismiss. Debtors have established the elements supporting issuance of an injunction in their favor. Further, in light of the opinion and order of the District Court affirming our order denying NJDEP's request to file a late proof of claim, the motion to dismiss the adversary will be denied and a permanent injunction will be issued as to Debtors. Because pursuit of the individuals would result in Debtors facing the same burden they would face in defending an action against themselves and because the New Jersey defendants indicated that their intent is to pursue only Debtors, this court will issue a preliminary injunction in favor of the individuals.

An appropriate order will be entered.

DATE:  April 1, 2008

Judith K. Fitzgerald
United States Bankruptcy Judge
jmd

cc:  David Bernick, Esquire
     Janet Baer, Esquire
     Lisa Esayian, Esquire
     200 East Randolph Drive
     Chicago, IL  60601

     James E. O'Neill, Esquire
     Pachulski Stang Ziehl & Jones LLP
     919 North Market Street, 17th Floor
     PO Box 8705
     Wilmington, DE  19899-8705

     Edward Devine, Esquire
     Rachel Jeanne Lehr, Esquire
     25 Market Street
     PO Box 093
     Trenton, NJ  08625-0093

11

053a

Anthony J. Marchetta, Esquire
Day Pitney LLP
200 Campus Drive
Florham Park, NJ  07932-0950

Anthony J. Marchetta, Esquire
Day Pitney LLP
PO Box 1945
Morristown, NJ  07962

John F. Dickinson, Jr., Esquire
Office of the New Jersey Attorney General,
      Division of Law
RJ Hughes Justice Complex
25 Market Street, PO Box 093
Trenton, NJ  08625-0093

Rachel J. Lehr, Esquire
Office of the NJ Attorney General,
      Division of Law
RJ Hughes Justice Complex
25 Market Street, PO Box 093
Trenton, NJ  08625-093

U.S. Trustee
844 King Street
Suite 2313
Wilmington, DE  19801

The Honorable Mary L. Cooper
Clarkson S. Fisher Bldg. and Courthouse
Courtroom 5W
402 East State Street, Room 2020
Trenton, NJ  08608

The Honorable Tonianne J. Bongiovanni
Clarkson S. Fisher Bldg. and Courthouse
Courtroom 6E
402 East State Street, Room 2020
Trenton, NJ  08608

12

054a

IN THE UNITED STATES BANKRUPTCY COURT
FOR DISTRICT OF DELAWARE

IN RE:

W.R. Grace & Co. , *et al.*
    Debtor(s)

Bankruptcy No. 01-1139-JKF
Chapter 11
Jointly Administered


W. R. Grace & Co., *et al.*
    Plaintiff(s)

v.

Adversary No. 05-52724


| | |
|---|---|
| Bradley M. Campbell, Commissioner of the New Jersey Department of Environmental Protection, in his official capacity; Peter C. Harvey, Attorney General of New Jersey, in his official capacity<br>    Defendant(s) | Related to Doc. No. 1, Complaint filed by Debtors for Declaratory and Injunctive Relief; Doc. No. 3, Debtors' Motion for Preliminary Injunction; Doc. No. 6 Motion to Dismiss Adversary Proceeding filed on behalf of New Jersey DEP, Commissioner of New Jersey DEP, and New Jersey Attorney General |


ORDER DENYING MOTION TO DISMISS AND ISSUING DECLARATORY
AND PERMANENT INJUNCTIVE RELIEF IN FAVOR OF DEBTORS

AND NOW, this ___1st___ day of ___April___, 2008, for the reasons stated in

the foregoing Memorandum Opinion, it is **ORDERED, ADJUDGED and DECREED** that the

motion to dismiss the adversary proceeding filed on behalf of New Jersey Department of

Environmental Protection (**"NJDEP"**) and Bradley M. Campbell, Commissioner of the New

Jersey Department of Environment Protection, in his official capacity, Peter C. Harvey, Attorney

General of New Jersey, in his official capacity is **DENIED.**

It is **FURTHER ORDERED** that Debtors' request for declaratory and injunctive relief

with respect to the prosecution of the New Jersey action is **GRANTED.**

1

055a

It is **FURTHER ORDERED, ADJUDGED and DECREED** that the civil action commenced by the NJDEP and the New Jersey Attorney General captioned "New York Department of Environmental Protection v. W.R. Grace & Co., Inc., W.R. Grace & Co.-Conn., Grace-Conn Successor, Jay H. Burrill, Robert J. Bettacchi" filed at Civ. No. L-001473-05 in the Superior Court of Mercer County, New Jersey, was filed in violation of the automatic stay of 11 U.S.C. §362 and is null and void as to Debtors.

It is **FURTHER ORDERED** that the NJDEP and Peter C. Harvey, the New Jersey Attorney General (the "New Jersey defendants"), are permanently enjoined from pursuing Debtors inasmuch as the state court action, removed to the District Court, was filed in violation of the stay and because, pursuant to the opinion of the District Court as related in the Memorandum Opinion accompanying this Order, the New Jersey defendants have no claim cognizable in this bankruptcy case with respect to this issue.

It is **FURTHER ORDERED** that, as to Debtors, the New Jersey defendants shall dismiss, with prejudice, the action at Civ. No. L-001473-05 in the Superior Court of Mercer County, New Jersey, and the removed action in the District Court for the District of New Jersey at Civil Action No. 05-4581, pursuant to the Memorandum Opinion accompanying this Order.

It is **FURTHER ORDERED** that, for the reasons stated in the foregoing Memorandum Opinion, the New Jersey defendants are preliminarily enjoined from pursuing their action against Mr. Bettacchi and Mr. Burrill until further order of this court.

It is **FURTHER ORDERED** that, appropriate, Debtors shall put this matter back on the agenda for status conference, with notice to all relevant parties.

Judith K. Fitzgerald
Judith K. Fitzgerald                                    jmd

2

056a

United States Bankruptcy Judge.

cc:   David Bernick, Esquire
      Janet Baer, Esquire
      Lisa Esayian, Esquire
      200 East Randolph Drive
      Chicago, IL  60601

      James E. O'Neill, Esquire
      Pachulski Stang Ziehl & Jones LLP
      919 North Market Street, 17th Floor
      PO Box 8705
      Wilmington, DE  19899-8705

      Edward Devine, Esquire
      Rachel Jeanne Lehr, Esquire
      25 Market Street
      PO Box 093
      Trenton, NJ  08625-0093

      Anthony J. Marchetta, Esquire
      Day Pitney LLP
      200 Campus Drive
      Florham Park, NJ  07932-0950

      Anthony J. Marchetta, Esquire
      Day Pitney LLP
      PO Box 1945
      Morristown, NJ  07962

      John F. Dickinson, Jr., Esquire
      Office of the New Jersey Attorney General,
          Division of Law
      RJ Hughes Justice Complex
      25 Market Street, PO Box 093
      Trenton, NJ  08625-0093

      Rachel J. Lehr, Esquire
      Office of the NJ Attorney General,
          Division of Law
      RJ Hughes Justice Complex
      25 Market Street, PO Box 093
      Trenton, NJ  08625-093

3

057a

U.S. Trustee
844 King Street
Suite 2313
Wilmington, DE 19801

The Honorable Mary L. Cooper
Clarkson S. Fisher Bldg. and Courthouse
Courtroom 5W
402 East State Street, Room 2020
Trenton, NJ 08608

The Honorable Tonianne J. Bongiovanni
Clarkson S. Fisher Bldg. and Courthouse
Courtroom 6E
402 East State Street, Room 2020
Trenton, NJ 08608

4

058a

IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

In re:                                    Bankruptcy No. 01-1139-JKF
                                          Chapter 11
W.R. Grace & Co., et al.                  Jointly Administered
        Debtor(s)


W.R. Grace & Co., et al.
        Plaintiff(s)

v.                                        Adversary No. 05-52724

Bradley M. Campbell,
Commissioner of the
New Jersey Department of
Environmental Protection,
in his official capacity;
Peter C. Harvey,
Attorney General of
New Jersey, in his
official capacity
        Defendants

## NOTICE OF APPEAL

The Commissioner of the New Jersey Department of Environmental Protection, in her official capacity and the Attorney General of New Jersey in her official capacity hereby appeal under 28 U.S.C. §158(a) from the Order (Doc. No. 30) of the Bankruptcy Court (Honorable Judith K. Fitzgerald, U.S.B.J.) entered on April 1, 2008, granting debtors declaratory relief finding that the exemption from the automatic stay, 11 U.S.C. 362 (b)(4), for actions under the State's police power does not apply to the State's action against the debtors.

059a

The names of all parties to the Order appealed from and the names and addresses, and telephone numbers of their respective attorneys are as follows:

**Counsel for Appellant**
**Rachel Jeanne Lehr, Esquire**
**Deputy Attorney General**
Richard J. Hughes Justice Complex
25 Market Street
Post Office Box 093
Trenton, New Jersey 08625-0093
Tel:(609)984-6640
Fax (609)984-9315

**John F. Dickinson, Jr., Esquire**
Deputy Attorney General
Richard J. Hughes Justice Complex
25 Market Street
Post Office Box 093
Trenton, New Jersey 08625-0093
Tel:(609)984-4654
Fax (609)984-9315

/S/ Stuart B. Drowos
Stuart B. Drowos (Bar 427)
Deputy Attorney General
Division of Revenue
Department of Finance
Carvel State Building
820 North French Street, 8th Floor
Wilmington, Delaware 19801

Local Counsel for Commissioner and
Attorney General of New Jersey

**Debtors/Appellees**

**David M. Bernick, P.C.**
**Janet S. Baer, Esquire**
KIRKLAND & ELLIS, LLP
200 East Randolph Drive
Chicago Illinois 60601
Tel: (302)861-2000

**Lori Sinanyan, Esquire**
KIRKLAND & ELLIS, LLP

777 S. Figueroa Street, Suite 3700
Los Angeles, California 90017
Tel:(213) 680-8209
Fax: (213)808-8004

**Laura Davis Jones, Esquire**
**James E. O'Neill, Esquire**
**Timothy P. Cairns, Esquire**
PACHULSKI STANG ZIEHL YOUNG JONES
& WEINTRAUB LLP
919 North Market Street, 17th Floor
Wilmington, DE 19801
Tel: (302) 652-4100


ANNE MILGRAM
ATTORNEY GENERAL OF NEW JERSEY


By: /S/ Rachel Jeanne Lehr

Rachel Jeanne Lehr
Deputy Attorney General


Dated: April 8, 2008

061a